FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
NOV 28 2017
JEFFREY P. COLWELL
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

TATONKA CAPITAL CORPORATION )
)
Plaintiff, )
)
) CIVIL ACTION 16-CV-01141-MSK-
v. ) NYW
)
MICHAEL CONNELLY, DAWN )
EIDELMAN AND GENE EIDELMAN )
)
)
Defendants.

## DEFENDANT MICHAEL CONNELLY'S BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

It is axiomatic that the Summary Judgment remedy is drastic and harsh and should be used sparingly. Summary judgment is appropriate only if the moving party is entitled to judgment as a matter of law – *i.e.*, it is able to show there is no genuine dispute or issue over any material fact, viewing the factual record in the light most favorable to the nonmoving party and resolving all doubts in favor of the non-moving party.

The motion is granted only when a party establishes, on papers alone, that there are no material issues and that the facts presented require judgment in its favor. The court's duty on this motion is not to resolve issues of fact or determine matters of credibility but merely to determine whether such issues exist. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gwinn v. Awmiller*, 354 F.3d 1211, 1215(10th Cir. 2004); Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 807 (10th Cir.1998); *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 491 (Colo. App. 2008).

Tatonka's motion fall far short of those requirements.

To buttress its claims, Tatonka proffers in the guise of "undisputed facts" (most of which are neither undisputed nor "facts") an interpretation of guaranties signed by the defendants that buggers common sense, distorts the record, contradicts the complaint and ignores the implied contractual duty of good faith and fair dealing inherent in every contract. The defendants, while not denying their execution of the guaranties in question, challenge the validity of the agreements and the extent, if any, of their liability

1

to plaintiff. The defendants have also asserted counter-claims, which plaintiff seeks to have dismissed, but which are riddled with factual dispute.

With respect to the guarantees, the record demonstrates that the parties had "a meeting of the minds," *i.e.*, the same understanding of the terms of the guarantees, until an alleged epiphany by plaintiff's former president 18 months after the parties had agreed that the guarantees had been satisfied and were no longer outstanding, an epiphany that Tatonka's CEO allegedly came to share a year later, but which was not communicated to defendants for more than six months after that. Not only is plaintiff not entitled to summary judgment, but as set forth below and in Mr. Connelly's cross motion, defendants are entitled to summary judgment dismissing the complaint.

**Summary of Argument: Tatonka's Breach of Contract Claim**

As plaintiff acknowledges, to prove a breach of contract claim, a plaintiff must prove (1) the existence of a contract; (2) performance by the plaintiff or some justification for non-performance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. See *Western Distributing v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). None of the four elements of a contract claim has been proven here – not even the first element, the existence of a contract.

Tatonka has not offered any evidence — because it cannot—that there was a "meeting of the minds" at the time the guarantees were drafted with respect to their current interpretation (which Tatonka now suggests is "undisputed"). In fact, it has not even alleged facts sufficient to demonstrate that a binding agreement with respect to the "guarantees" was ever formed. The two Tatonka executives involved in the Tatonka/Mosaica relationship, testified that they had understood and agreed with defendants' consistent and contemporaneously documented understanding of how the guarantees worked (see discussion below) until, in the case of Tatonka's former President, January 2015 (18 months after the last "guarantee" had been satisfied) and, in the case of Tatonka's CEO, until some time in 2016.

As a result, Tatonka fails on the very first element of a breach of contract claim. See *Schmidt v. Frankewich*, 819 P.2d 1074, 1077 (Colo. App. 1991) (finding no contract existed because of a lack of a meeting of the minds and mutual assent). In Schmidt, the Court ruled that a contract "may be implied from conduct of the parties," citing *People v. Razatos, 636 P.2d 666 (Colo. 1981)*, but noted that the parties must agree upon all essential contractual terms. See *I.M.A., Inc. v. Rocky Mountain Airways, Inc., 713 P.2d 882 (Colo.1986)*; Restatement (Second) of Contracts § 17(1) (1981):

"Agreement to essential contractual terms is evidenced by the parties' manifestations of mutual assent. *I.M.A., Inc. v. Rocky Mountain Airways, Inc., supra*. If the parties fail to agree to sufficiently definite and certain terms, there is no meeting of the minds and, hence, no valid contract. *Sunshine v. M.R. Mansfield Realty, Inc., 195 Colo. 95, 575 P.2d 847 (1978)*." *Ibid.*

2

See also *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). In *Marquardt*, the defendant issued a written guarantee to induce plaintiff to provide the funds he needed to make an investment. The Court found that while it was undisputed that the defendant had in fact issued his written guarantee as alleged, there was no evidence that the plaintiff had countersigned the guarantee or delivered a fully executed copy to the defendant to indicate her acceptance of his offer. As a result, the Court ruled that, under Colorado law, there was a question of fact whether a contract had been entered into. The jury determined by special interrogatory that the defendant had offered to guarantee the investment but the plaintiff had not proved that she had accepted the offer. It thus found in favor of the defendant.

As the Marquardt court noted, "a contract is formed when an offer is made and accepted, *see Scoular Co. v. Downey*, 151 P3d 615, 617 (Colo. App. 2006), and the agreement is supported by consideration. See *Clark v. Scena*, 83 P.3d 1191,1194 (Colo..App. 2003); *see also Denver Truck Exch. V. Perryman*, 134 Colo. 586, 592, 307 P.2d 805, 807 (1957).

In this case, none of the guarantees allegedly signed and proffered to plaintiff by Mr. Connelly were counter-signed by Tatonka (see exhibits 4-9 to plaintiff's motion), and plaintiff does not even allege that any of them was delivered to Mr. Connelly. As a result, plaintiff's summary judgment motion must be denied because under Colorado law there is a question of fact as to whether a binding contract was ever entered into. (In *Marquardt*, the plaintiff had also included a claim for promissory estoppel, which is permissible under Colorado law under certain circumstances when there is no enforceable contract. That is not the case here. In its motion papers, Tatonka has specifically affirmed that that it is only pursuing a contract claim and is not alleging promissory estoppel – which it manifestly would not have been able to prove in any event.)

In addition, to the extent that the Guaranties were for pre-existing debt (as opposed to new advances), they lack consideration. It is settled law that a contract of guaranty entered into concurrently with the principal obligation is supported by the same consideration which underlies the principal contract. See *e. g.*, Erie County Savings Bank v. Coit, 104 N.Y. 532, 11 N.E. 54 (1887); Beacon Hold. Corp. v. Sparinger, 256 App.Div. 606, 11 N.Y.S.2d 48 (1st Dep't. 1939). But it is equally well-settled that the promise to pay an antecedent debt is not regarded as consideration for a guaranty, which is simply an unenforceable promise. See Lagomarsino v. Gianm, 80 P 698 (Cal. 1905); State Bank v. Pickens, 237 P. 651 (Kan. 1926); Hedden v. Schneblin, 104 S.W. 887 (Mo. Ct.App. 1907).

That is especially true here, where the defendants are minority shareholders with financial interests dwarfed by the assumption of antecedent liability alleged by plaintiff. Tatonka maintains, for example, that in 2013 Mr. Connelly agreed to guarantee – apparently in perpetuity – millions of dollars of antecedent debt of a corporation he didn't control.

3

## Statement of Facts

Mosaica Education, Inc. ("Mosaica" or the "Company") was founded by Gene and Dawn Eidelman in January 1997, for the purpose of managing public charter schools. It opened its first school in Michigan in September 1997 and its second school in Pennsylvania in September 1998. Michael Connelly joined Mosaica as its Chief Executive Officer shortly thereafter, and for the next 16 years, he, Mr. Eidelman (President) and Dr. Eidelman (Chief Education Officer) were employed as executive officers of the Company. Mr. Connelly and Dr. Eidelman also served on the Company's board of directors. Connelly Affidavit, Para 3.

The Company was headquartered in New York, where Mr. Connelly and the Company's Chief Financial Officer and finance team were based. The Company also had an executive office in Atlanta, where the Eidelmans, and the Curriculum Development, Business Development, HR, and IT executives were located. The Company's Chief Operating Officer (there were three different COOs in the 17 years of Mosaica's existence) was based in one of the two executive offices, and the other operating executives were housed in one of Mosaica's six regional offices. *Id*, para. 3.

Under the collective leadership of the executive team, the Company grew from two schools to 93 schools, operating in 14 states and four foreign countries (U.K., India, Abu Dhabi and Qatar), with 1,800 employees and approximately $125 million in revenues. Nine institutional private equity firms or their affiliates and partners invested in Mosaica, controlling the board and diluting management's ownership substantially. By 2013, Mr. Connelly's equity position (shareholdings + options) was less than 6%, and the Eidelmans' was approximately 10% each. Approximately 5% of the Company was held by other Mosaica executives, and about 2% was owned by Tatonka's four principal officers and owners. (The Tatonka principals purchased their shares by issuing Notes, on which they defaulted. Mosaica may have reclaimed their shares in exchange for cancelling their Notes after Mr. Connelly left the Company.) *Id*, para. 4.

The private equity investors owned the remaining approximately 67% of the shares, all in the form of preferred stock, meaning that it was senior to the stock held by the defendants in the event of a sale or liquidation of the business. It also carried special voting rights with respect to capital transactions and other corporate actions and entitled the preferred stock holders to five of the seven seats on the board of directors. *Id*, para. 5.

Plaintiff Tatonka Capital Corporation is an asset-based lender and leasing company. Its core business model consisted of (i) placing or selling notes and leases of borrowers with third-party investors and then servicing those loans and leases (*i.e.*, collecting, processing and disbursing payments and receipts, creating escrows for taxes and insurance and otherwise managing "back office" operations) and (ii) lending money in its own name as senior lender to a small group of customers. Tatonka also provides

fee-based investing banking and advisory services to clients seeking capital or trying to buy or sell assets. *Id*, para. 6.

Tatonka and Mosaica began doing business together in 1999, when Tatonka financed the lease of modular classroom units for a Mosaica school in Delaware. In 2001, Mosaica acquired another charter school management company, Advantage Schools in Boston, MA. Advantage had financed several schools through Tatonka, and in conjunction with the merger, Mosaica agreed to assume those obligations. Over the next 15 years, Tatonka functioned as Mosaica's senior lender and financial adviser. The two companies entered into a plethora of financial instruments, including mortgages on school buildings that Mosaica managed, leases for furniture, fixtures and equipment used in those schools, revolver loan agreements to finance Mosaica's accounts and notes receivable, and letters of credit issued by Tatonka to collateralize Mosaica obligations to third parties. By its calculation, at its peak, Tatonka had loans of more than $22 million outstanding to Mosaica and its subsidiaries. *Id*, para. 7.

Among the various Tatonka loan documents were two lines of credit, each capped at $10 million. Only one of the lines of credit is at issue in this case, the "Revolver Loan and Security Agreement" (the "Revolver"), initially entered into on or about October 31, 2007. (Complaint, para. 6). Under that line, Mosaica could request, subject to Tatonka's approval, a drawdown of funds to purchase real property or equipment, for working capital or for any other corporate purpose. *Id*, para. 8.

As security for the repayment of the indebtedness, Mosaica and each of its subsidiaries executed various instruments, including mortgages, deeds of trust and guarantees by the corporate subsidiaries in favor of plaintiff. The defendants were not parties to the loan agreements and other than the limited guaranties of the Revolver at issue in this litigation (which were executed by defendants six years after the Revolver was first established), they did not guarantee any of the loans. The Revolver was secured with a first mortgage on specified properties, a first lien on Mosaica's accounts and loans receivable and a second lien on all other Mosaica assets. (There were purchase money mortgages, sale-leasebacks and other financings provided by third parties, where Tatonka's security interest was subordinated to that lender's lien, and there were first-lien pledges securing other obligations to Tatonka (some or all of which had been pledged by Tatonka to its lenders), where the holder of the Revolver had a contingent interest in the pledged assets to the extent that their value exceeded Mosaica's obligation under the instrument with the first lien.) *Id*, para. 10.

The Revolver, the other $10 million line of credit, and most, if not all, of the other Tatonka loans were guaranteed by Mosaica's subsidiaries and corporate affiliates. But from the beginning of the relationship in 1998 until 2013, none of Mosaica's obligations to Tatonka was guaranteed, in whole or part, by Mr. Connelly, the Eidelmans or any Mosaica shareholder, director, officer or employee. *Id*, para. 11.

The initial term of the Revolver was for two years, but that date was "rolled over" several times; the amounts outstanding and/or available to be drawn down were modified multiple times; the interest rate and amortization schedule were occasionally revised; and there were other technical amendments to the document over the years. According to the complaint, the parties entered into 27 modification agreements of one type or the other in the six years between 2007 and 2013. (para 7). Mosaica made scheduled monthly interest and principal payments under the Revolver from October 2007 through at least December 2013. [Tatonka alleges that Mosaica defaulted under the Revolver in late 2003. The defendants dispute that claim and maintain that the initial default did not occur until July 2014. That dispute is not relevant to the instant motions.] *Id*, para. 12.

**The Guarantees**

In June 2012, Mosaica sold one of its school properties and used the proceeds to make a significant pre-payment on the Revolver, reducing the amount outstanding to approximately $3,285,000. By mid-January 2013, Tatonka had advanced an additional $925,000, bringing the principal amount outstanding to approximately $4,206,000, and leaving approximately $5.8 million in potential availability under the Revolver. *Id*, para. 13. But when Mosaica requested an additional draw in January 2013, Mr. Connelly was informed by Carol Hansen, Tatonka's CEO, that while she would try to arrange funding, she warned that Tatonka had "exhausted our own excess reserves" and "are not able to draw down on either of our bank lines . . .due to technical defaults." (Connelly affidavit, Exhibit 1). She even noted that the company had borrowed money from the 401(k) account of Robert Bauers, Tatonka's chairman and principal sharelholder, and could not do so again "due to IRS rules." *Ibid.*

She proposed that Tatonka utilize "other people's money," *i.e.*, "[f]unds we hold on account waiting for their due date." Calling it a "new category of money," Ms. Hansen acknowledged that the proposal was so sensitive, she did not want Eric Gorka, Tatonka's former president, to know about it "because he hates when I am this blunt." Mr. Connelly understood that Ms. Hansen was describing what the parties referred to as the "Vectra Trust Account," a segregated account at Vectra Bank that borrowers under the loans and leases Tatonka serviced for third-party investors sent their monthly principal and interest payments. Mr. Gorka had previously told Mosaica that the account was established to insulate those receipts and disbursements from creditors, meaning that counter-parties could deposit funds in the account without concern that creditors of Tatonka or any of its customers could attach or freeze the account. Because of timing differences between the date of receipts and the payment dates to the investors that Tatonka allegedly structured into its servicing agreements, there was a substantial "float" in the account that did not have to be forwarded to third-party investors for 45-60 days. *Id*, para. 14.

In her email, Ms. Hansen explained that because funds were ultimately "due to people and financial institutions," Tatonka would "need a hard and accurate repayment date" for the additional advance and "would be asking for Gene and Dawn's personal

6

guarantees on this." It was ultimately agreed that Tatonka would advance an additional $310,000 under the Revolver on January 22, 2013, provided that the Eidelmans and Mr. Connelly guaranteed that it would be repaid no later than February 13, 2013, which was when Mosaica next expected to receive significant government funding for its schools, which it could use to repay the advance. The plan was that both Eidelmans and Mr. Connelly would guarantee the advance, to ensure that Tatonka would have recourse if the funds were not received. The documentation of the guarantee and the amendment to the Revolver agreement was drafted by Tatonka and forwarded to Mosaica's New York office. It was near the end of the day, with literally minutes to spare to fund Mosaica's payroll, and Mr. Connelly hurriedly signed the signature pages as he was leaving the office for the airport. The Company's CFO emailed to the Eidelmans their guarantee forms, with instructions to sign and return them to Tatonka, which they did. Only after the signed forms were sent to Tatonka was it discovered that the amount of the guarantee limit was not $310,000, as had been agreed, but was actually written as $1,435,000. When the error was discovered, those guarantees were voided and returned to defendants, replaced by a guarantees expressly limited to $310,000. (Ironically, the original $1,435,000 guarantee that was voided and returned to Mr. Connelly was apparently the only one signed or otherwise acknowledged by Tatonka.) *Id*, para. 15; See Exhibit 2.

On February 7, Mosaica required an additional advance of $308,000, which it could promise would be repaid no later than March 13. Thus the $310,000 guarantee was superseded by one limited to $618,000, and the Revolver maximum was increased by $308,000 until March 13, 2013 (the $310,000 increase until February 13 remained in effect, and was paid down when due, reducing the over-advance amount to $308,000. An additional $345,000 was borrowed on March 7, bringing the guaranteed amount to $653,000, all due no later than March 13. On March 13, the full $653,000 was repaid, as documented in an email from Mosaica's CFO. (Connelly Affidavit, para 16 andExh. 3)

That email authorized Tatonka's CFO (the email was also copied to Tatonka's former President) to transfer the $653,000 from Mosaica's funds in "the account held in trust for Mosaica Education at Vectra Bank" (*i.e.,* the "Vectra Trust account" referred to above) "***in satisfaction of the [Connelly and Eidelman] guarantees***." The email requested documentation "that this has been done as the guarantees commit to a March 13 repayment." Tatonka's CFO not only transferred the funds in accordance with the instructions, but he also confirmed in writing that the payments had been received and, implicitly, that the guarantees had been satisfied, provided that Tatonka would also receive its normal monthly principal and interest payments, which Mosaica's CFO confirmed would be authorized that same day. Id, para 17. Whether one considers Tatonka's conduct and written confirmation a release of the outstanding guarantees or confirmation that the parties had agreed at the outset that that the guarantees were limited to the short-term advances, plaintiff is clearly estopped from claiming that the guarantees have not been satisfied.

7

Similarly, on April 9, 2013, Mosaica took another short-term advance, this time for $300,000 to be outstanding for three days. On April 12, Mosaica repaid the advance when it came due, which Mr. Connelly confirmed in an email to Tatonka's CFO (copied to its former President and its Controller). In addition to confirming that the $300,000 advance had been repaid "in satisfaction of [Connelly's and the Eidelmans'] guarantee," he also authorized (i) payment of the regular principal and interest due on the Revolver and the other notes and lines of credit outstanding and (ii) payment to Spirit Finance, another Mosaica creditor. Once again, Tatonka's CFO confirmed receipt of the funds and the wire transfer. *Id*, para. 18, Exhibit 4.

And so it went. Between January 22 and August 13, 2013, Tatonka agreed to seven short-term advances, ranging from $300,000 to $1.6 million, each of which was outstanding for less than a month – in most cases for less than a week. In each case, the advance was used to fund payroll or some other time-sensitive payment, and in each case the defendants had signed a guarantee, which it proffered to plaintiff, that the amount would be repaid from a funding the Company was scheduled to receive. The last such advance was made on August 13, 2013. It was repaid from the Ohio state funding the following day. See email from Mosaica's CFO to Tatonka's CFO and former president. Id. Para 19, Exhibit 5.

After the August 2013 advance was repaid, no additional guarantees were issued or requested; Mr. Connelly and the Eidelmans understood that they had no further liability under the previously signed guarantees; and there was no suggestion that Tatonka believed otherwise. . . . literally until this lawsuit was filed three years later. Indeed, when Tatonka declared Mosaica in default in July 2014, Tatonka's former president represented in writing to Messrs. Connelly and Eidelman that he was "confident that there are no personal guarantees from [Mr. Connelly or the Eidelmans] relating to the short term advances or other loan documents." He said that Tatonka's then-CFO was "reviewing the documents to make certain that they reflect the agreements and that the short term advances have all been paid. I believe that they have but just making sure." Id. Para 20, Exhibit 6

Tatonka characterizes that email as "qualified" and, somewhat bizarrely, delinquent in that it was sent almost a year after the last guarantee. But for two full years thereafter, no additional response or other communication of any nature whatsoever was received by the defendants from plaintiff, its counsel or anyone else representing plaintiffs in respect of the guarantees. Id., para 21.

Under the Uniform Commercial Code, "every contract or duty . . . imposes an obligation of good faith in its performance or enforcement." Tatonka's conduct in accepting performance under the guarantees, explicitly acknowledging such performance, and ultimately releasing defendants from any liability, only to assert three years later that it had changed its position is a clear breach of that good-faith obligation. See 5 Williston on Contracts Sec. 665 (1961) ("Especially words literally appropriate for conditions have not been given their natural meaning where the consequence would lead to injustice and a violation of the probable intent of the parties.")

8

## Collateral Estoppel and Res Judicata

Tatonka also claims that the defendants are collaterally estopped from contesting the amount owed by Mosaica as calculated in the "unopposed" judgment entered at Tatonka's request in the receivership action. It argues that the issue in the receivership case is identical to one in the instant case, thereby giving rise to "issue preclusion," which bars a party from relitigating an issue once that party has suffered an adverse determination on that issue. As explained below, collateral estoppel does not apply because the defendants were not a party or in privity with a party in the Receivership case. Nor are the issues raised in the Receivership case "identical" to the issues decided in the instant case.

Each Guaranty is, by its terms, limited to guaranteeing obligations under the "Loan Agreement," which is defined in the first paragraph of the Guaranty as the "Revolving Loan and Security Agreement, dated as of October 30, 2007" – referred to as the "Revolver" herein. See, for example, Exhibit 4 of Plaintiff's Summary Judgment motion. If the Revolver has been paid off, which seems likely given the value of the collateral securing that loan, the Cause of Action in the Complaint is moot and must be dismissed. Rather than provide evidence – or even allege -- that there are amounts owing under the Revolver, Tatonka alleges merely – both in this motion and in its complaint – that a $5 million judgment was entered against Mosaica in favor of Tatonka in December 2015.

Given that Tatonka failed to plead in its Complaint that there was a default on the Revolver (or any amount outstanding thereunder), defendants both raised Tatonka's failure to state a claim upon which relief can be granted as an affirmative defense. That defect has not been corrected, and yet Tatonka argues on this motion that "there is no basis whatsoever for this defense," suggesting that it is "plausible" to allege that the guarantees of amounts due under the Revolver (subject to the dollar-amount limitations in the guaranties themselves), might actually be for all amounts deemed to be owed by Mosaica to Tatonka, as "determined" by a motion filed without opposition – but also without support or affirmative agreement -- by the Receiver. The Receiver has no financial or other incentive to dispute Tatonka's calculations, whereas it has a strong financial incentive to support Tatonka, the only entity in a position to challenge the Receiver's fees. Indeed, as a case in point, the Receiver did not oppose a $500,000 reduction in Tatonka's credit bid (with the effect of increasing Tatonka's judgment by the same amount) based on the spurious argument that when the bid was made, Tatonka thought that the assets to be purchased included claims against Tatonka by Mosaica shareholders – claims that by definition were never part of the Receivership or Mosaica assets because they belonged to Mosaica's shareholders, not the Company.

Tatonka also suggests that the Connelly's counter-claim is barred by *res judicata* because it is allegedly no different from claims allegedly pursued in the receivership action. In a circular argument, it maintains that Connelly lacks standing to assert the counterclaim because it is actually a claim that belongs to Mosaica. That assertion is factually inaccurate and is inconsistent with this Court's earlier decision in this case. The Recommendation of the United States Magistrate Judge (Dkt 68), filed December 29, 2016, at pages 15-16, notes that Mr. Connelly's counter-claim includes a claim that Tatonka was acting as a fiduciary of Mr. Connelly, had breached its fiduciary duty to him and that he had incurred damages as a result of that breach. The Court specifically ruled that "Mr. Connelly adequately pleads a breach of a fiduciary duty claim as his Second Counterclaim against Tatonka."

As the Court noted, where a lender that has established a relationship of trust and confidence exercises excessive control over a borrower's affairs, engages in inequitable or fraudulent conduct with respect to other creditors or in conduct proscribed by law, the lender may be held liable to third parties for damages and may find its claims equitably subordinated to claims of those third parties or have its receipts deemed to be held in a constructive trust for the benefit of other parties.

See, for example, *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399 (6th Cir. 1984), where the court noted that the lender's supervision of payments, the reduction of the salary of the borrower's president, and the hiring of an accountant chosen by the lender – conduct far less controlling than Tatonka engaged in here -- could be considered evidence that the lender had taken control of its borrower.

See also *Duffield v. First Interstate Bank*, 13 F.3d 1403 (10th Cir. 1993), in which a bank exercised a "right of assignment" by requesting that the operators of the borrower's wells send all proceeds directly to the bank. The 10th Circuit Court of Appeals held that under applicable Colorado law, even where the express terms of a contractual provision appear to permit unreasonable actions, "the implied duty of good faith and fair dealing limit[s] the parties' ability to act unreasonably in contravention of the other party's reasonable expectations." More specifically, the court reiterated its prior holding in *Big Horn Coal Co. v. Commonwealth Edison Co.* that "'where a contract provision is exercisable only at some discretion of one of the parties, and expectations are created by the contract, good faith limitations are applicable to protect" other parties. Duffield makes clear that a lender's course of conduct can give rise to liability for breaching its duty (and implied covenant) of good faith -- even when it purports to be exercising its contractual rights, particularly where, as here, the lender's course of conduct created reasonable expectations on the part of the borrower and guarantors.

In sum, whether Mosaica has or had a cause of action against Tatonka and/or whether Mr. Connelly may have had standing to assert that cause of action is irrelevant. Mr. Connelly's claim against Tatonka is for a breach of its fiduciary duty to Mr. Connelly after Tatonka took control of Mosaica's operations and treasury.

To be barred under the doctrine of *res judicata*, there must be a judgment on the merits in a prior suit involving the same parties or their privies and based on the same cause of action. See, *e. g., Parklane Hosiery Co. v. Shore*, 439 U. S. 322, 326, n. 5 (1979). See also *Goddard v. Security Title Ins. & Guarantee Co.*, 14 Cal. 2d 47, 51, 92 P. 2d 804, 806 (1939) ("[A] final judgment, rendered upon the merits by a court having jurisdiction of the cause . . . is a complete bar to a new suit between [the parties or their privies] on the same cause of action"). There has been no prior case in which a cause of action based on a breach of Tatonka's fiduciary duty to Mr. Connelly has been asserted, much less precluded by a prior "judgment on the merits."

On its claim of "collateral estoppel" and "issue preclusion," Tatonka has the burden of establishing four separate elements: (1) the issue decided in the receivership action must be "identical" to the one presented in the instant action; (2) the prior action must have been finally adjudicated on the merits with respect to that issue; (3) the defendants in this case must have been parties or in privity with a party in the receivership case; and (4) they must have had a full and fair opportunity to litigate the issue in the prior action. *Dodge v. Chrysler*, 203 F.3d 1190, 1198 (10th Cir. 2000); *Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 84 (Colo.1999); *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992); see also *Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009); Park Lake Res. LLC v. U.S. Dep't of Agr., 378 F.3d 1132, 1136 (10th Cir. 2004). Collateral estoppel operates as an affirmative defense, and as the party invoking the doctrine, Tatonka has the burden of proving all the elements are met. Cf. Taylor v. Sturgell, 553 U.S. 880, 907 (2008). It has failed to meet that burden.

Messrs. Connelly and Eidelman were not parties or in privity with a party in the Receivership Case. Tatonka argues that the Court in that case "expressly granted standing to Defendants Connelly and Gene Eidelman, as shareholders of Mosaica, to assert and prosecute 'defenses and claims against Tatonka' on behalf of Mosaica." In fact, recognizing the conflict of interest in expecting the receiver to press claims against Tatonka, given that it literally owed its appointment to Tatonka, the Court's order appointing the receiver granted standing to all Mosaica shareholders to assert defenses and claims *on behalf of the Company* (emphasis added).

What that meant was only that any shareholder would be allowed to hire a lawyer to represent Mosaica, but the Receiver refused to use Mosaica resources to pay the lawyer, and the Court refused to order the receiver to do so. Any benefit from successfully asserting a claim or defense would redound to Mosaica as a corporation, not to the shareholder financing the litigation.

The Court in the Receivership case did not allow shareholders to appear *pro se* on behalf of Mosaica, and counsel of record for Mosaica in that litigation declined to

collaborate with shareholders because counsel had been retained as counsel for the Receiver and was working with counsel for Tatonka. Indeed, as Tatonka concedes, the Receiver and its counsel failed even to oppose Tatonka's motion to dismiss the counterclaim that had been filed or its motion for judgment. As a result, there was no decision "on the merits" in the Receivership case, which is required for a prior judgment to have claim-preclusive effect.

Tatonka asserts that *Coffee Iron Works v. QORE*, 744 S.E.2d 114, 118-19 (Ga. App. 2013) held that guarantors, shareholders and officers are "privies with corporations." In fact, that court ruled,

> "There is no definition of 'privity which can be automatically applied to all cases involving the doctrines of res judicata and collateral estoppel, since privity depends upon the circumstances. Privity may be established if the party to the first suit represented the interests of the party to the second suit. Here, it is clear that Floriece's claim is premised on the liability initially litigated unsuccessfully by Douglas Asphalt, the corporation by which she claims her interest now. Her stated argument only asserts liability to the extent that Douglas Asphalt was wronged, and Douglas Asphalt fully litigated this interest in the federal litigation. Under these circumstances, the trial court correctly found Floriece to be in privity with Douglas Asphalt for purposes of this litigation (footnotes omitted)

In the instant case, Mr. Connelly is not asserting a cause of action because Mosaica "was wronged" by Tatonka's actions, but, rather, because *he* was wronged. The damages he has alleged are separate and distinct from those suffered by Mosaica. For example, Mr. Connelly alleges that Tatonka converted to its own use Mosaica funds held in the Vectra Trust Account that had been designated for tax withholdings and pensions and that it otherwise used its position of control over Mosaica's funds and operations to prevent the Company from paying employee tax withholdings. Whatever liability to Mosaica and/or the taxing authorities that action may have given rise to, it also caused Mr. Connelly personally, , to incur a liability to the I.R.S. for $1.2 million in penalties because he was an officer and director of Mosaica at the time.

It is undisputed that Mr. Connelly was not a party to the Receivership case, nor that he had any obligation to intervene in that case or otherwise controlled either Mosaica or the conduct of the litigation. On multiple occasions, he and Mr. Eidelman asked the Receiver to investigate their concerns that Tatonka had engaged in misconduct that damaged Mosaica. The Receiver refused.

It is beyond ironic that Tatonka is invoking a rule designed to avoid a multiplicity of suits to justify its own decision to bring multiple lawsuits (which it now maintains raise identical issues). Tatonka did not join Connelly or the Eidelmans as defendants in the Receivership action but now argue that those individuals are barred from asserting defenses and claims that might have been permissible (or even mandatory) if they had

been named in the initial suit. Whether the failure to include them in that litigation was tactical, strategic, or an implicit admission that the defendants had no ongoing liability under their individual guarantees -- Tatonka did name as defendants five corporate guarantors of Mosaica's debt – Tatonka should not be allowed to weaponize its decision and use it to gain a legal advantage in this case. As the 11th Circuit held in *Montgomery Ward Dev. Corp. v. Juster,* 932 F.2d 1378 1383 (11th Cir.1991), "We do not find that appellant . . . who . . . was not joined as a defendant in the [initial] suit, can be barred for the very reason that [plaintiff-appellee] did not join him."

As the Colorado Surpreme Court ruled in *Bebo Constr. Co., supra,* 990 P.2d at 85, for an issue to be "actually litigated," "the issue must [have been] submitted for determination and then *actually determined by the adjudicatory body.*" *Id.* (emphasis added). In the instant case, Tatonka admits that the Court in the Receivership case did not "actually determine" any issues relating to the counterclaims and affirmative defenses Mosaica pleaded against Tatonka (much less to the individual claims herein by Mr. Connelly). Instead, it grasps at the straw that the Receivership Court said that it had "reviewed the merits of the [unopposed] motion and finds the arguments therein well-taken," after the Court held that the motion to dismiss was "unopposed and due to be granted for that reason alone." Reading one party's argument and labeling it "well-taken" is obviously far different from "actually litigating" an issue. Moreover, the admission that the order could be granted based on the lack of opposition alone, means that the "well-taken" assessment was not necessary to the adjudication, which is another requirement for issue preclusion.

The Restatement (Second) of Judgments (§ 27 cmt. e (1982)) makes clear that whatever other defects bedevil Tatonka's collateral estoppel and *res judicata* arguments, the fact that the Receivership case decisions Tatonka relies on were "unopposed" renders those doctrines inapplicable: "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention."

The 10th Circuit faced a similar situation in *Nichols v. Bd. Of County Com'rs*, 506 F.3d 962, 969 (10th Cir. 2007), a case cited by Tatonka in its motion: "Therefore, under the 'actually litigated and necessarily adjudicated' element of Colorado's collateral estoppel test, the VanDenBerg Settlement does not have preclusive effect on any of the issues in controversy in the instant litigation."

Whatever hypothetical "identity of interest" might have existed between Mosaica and Mr. Connelly before the Receiver was appointed, after the Receiver was appointed, there was none. While Mr. Connelly remains a small shareholder, he was terminated as an employee and removed as an officer and director by the Receiver, who appointed one of its employees as Mosaica's sole officer and director. Mr. Connelly was not served by Tatonka with motion papers on the motions referred to in plaintiff's motion here, which were apparently granted by default and/or without opposition, he was not

consulted by Mosaica, the Receiver or counsel for the defendants with respect to those motions and was not even aware that the motions had been made.

The Court in *Chase Manhattan Bank, N.A. v. Celotex Corporation*, 56 F.3d 343 (2d Cir. 1995) addressed the question of collateral estoppel as follows:

> "As Professor Vestal has written, 'the key seems to be that [the] interests [of the non-party] have been adequately represented by others who have litigated the matter and have lost ...' Id. at 128. Federal courts have sometimes called this 'virtual representation.' See Aerojet-General Corp. v. Askew, 511 F.2d 710, 719 (5th Cir.) (person can be bound by prior judgment "if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative"), cert. denied, 423 U.S. 908, 96 S. Ct. 210, 46 L. Ed. 2d 137 (1975).

> "[Defendant's] formalistic approach ignores first principles. Privity may exist for the purpose of determining one legal question but not another depending on the circumstances and legal doctrines at issue. Whether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions. Some courts have thus held that the inquiry is a factual issue. Expert Elec. Inc., 554 F.2d at 1233; Aerojet-General Corp. v. Askew, 511 F.2d at 719 ("The question whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court.").

> "For purposes of claim preclusion, the requisite privity must be found in the substantial identity of the incentives of the earlier party with those of the party against whom res judicata is asserted. The question thus is whether NYPBC had an interest in pursuing a property damage claim against the asbestos manufacturers sufficiently similar to Chase's interest in pursuing the same claim as to have created virtual representation. Absent such an identity of incentives, the application of claim preclusion against Chase would violate concepts of elemental justice and probably due process.

> 'In the instant matter, Chase and NYPBC, as buyer and seller, are no doubt in privity for many purposes. However, the precise issue is whether NYPBC's incentives to pursue its lawsuit were substantially similar to Chase's. The answer is that clearly they were not."

Similarly, Mosaica's and the Receiver's incentives to pursue claims against Tatonka in the Receivership action were clearly not "substantially similar" to Mr. Connelly's, especially given that Tatonka was in active concert and participation with the Receiver in arranging for the bulk sale of Mosaica's assets and liquidation of the Company.

14

Acknowledging that Georgia law determines the issue-preclusive effect of the Receivership case, Plaintiff relies on *Lilly v. Heard*, 761 S.E.2d 46 (Ga. 2014). But the *Lilly* decision supports defendants' position in this case. Issues of res judicata and collateral estoppel under Georgia law are governed by statute, O.C.G.A. § 9-12-40: "[a] judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside." Thus, three prerequisites must be met before res judicata will apply: (1) identity of the cause of action; (2) identity of the parties or their privies; and (3) a previous adjudication on the merits by a court of competent jurisdiction. Crowe v. Elder, 723 S.E.2d 428, 430–31 (Ga. 2012)." As the *Lilly* decision makes clear, none of those prerequisites is present here.

Stating that "the general rule is that a 'judgment binds only the parties to a case," *Lilly* noted that there is a "limited exception for 'privies,' . . . generally defined as 'one who is represented at trial and who is in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right.' See Brown & Williamson Tobacco Corp. v. Gault, 280 Ga. 420, 421(1), 627 S.E.2d 549 (2006) (citation omitted)." The exception made in the *Lilly* case was expressly limited to situations "where a taxpayer or property owner brings an action against a county or its officers upon a matter of public and general interest to all other taxpayers of such political subdivision, and the action either expressly or by necessary implication is on their behalf."

Plaintiff's reliance on *Bunnett v. Smallwood*, 768 P.2d 736, 740 (Colo. App. 1988) is similarly misplaced. The holding in that case was not that a "guarantor who was corporate president, director and stockholder was privy" (*sic*). The Court ruled that it was a question of fact for a jury as to whether, under the facts of the case, the sole shareholder of a closely held corporation intended to bind himself and his corporation when he agreed to release the defendant (who was himself a former shareholder and officer of the corporation). The Court invoked the collateral estoppel standard to prevent the shareholder from re-litigating that exact issue in a separate action.

Tatonka also relies on *Crowe v. Elder,* 753 S.E.2d 428 (Ga. 2014) for the proposition that "[a] cause of action has been deemed to be the 'entire set of facts which give rise to an enforceable claim,'" The *Crowe* court quoted that language from *Morrison v. Morrison,* 284 Ga. 112, 116(3), 663 S.E.2d 714 (2008), which Tatonka failed to note in its brief. That oversight is not surprising, since the Georgia Supreme Court in Morrison ruled that [t]he issue sought to be precluded *must actually have been litigated and decided in the first action* before collateral estoppel would bar it from being considered in the second action, or the issue *necessarily had to be decided in order for*

*the previous judgment to have been rendered.* [Cit.] (Emphasis in original.) *Karan v. Auto-Owners Ins. Co.,* 280 Ga. 545, 547, 629 S.E.2d 260 (2006)"

In *Morrison*, the lower court had ruled that appellants were estopped from litigating their claim that the appellee had breached his fiduciary duty to them as their father's executor and attorney-in-fact because the probate court had rejected their argument that the father's written instructions to appellee amounted to a constructive amendment of his will. The court ruled, "However, the probate court did not decide the issue of whether Appellee breached his fiduciary duties as testator's attorney in fact, or intentionally interfered with an expected gift, by failing to comply with his written directions in 2003."

Similarly, the Receivership case may have actually or constructively dealt with legal and factual issues with respect to the relationship between Tatonka as lender and Mosaica as borrower, and the rulings in that case might be relevant if, say, defendants here were bringing a derivative action on behalf of Mosaica. But the court in the Receivership case did not decide any issues relating to Tatonka's fiduciary duty to defendants or to defendants' obligations *vel non* under the Guarantees.

The Georgia Supreme Court in *Morrison* also noted that another reason the Appellants' claims in that case were not barred by the earlier probate court case is that the requisite "identity of the cause of action" was missing: "The fact that the subject matter of different lawsuits may be linked factually does not mean that they are the same `cause' within the meaning of OCGA § 9-12-40. ..." Gunby v. Simon, 277 Ga. 698, 700, 594 S.E.2d 342 (2004). "For that doctrine to act as a bar, `the cause of action in each suit must be identical.' [Cits.]" Haley v. Regions Bank, 277 Ga. 85, 91(2), 586 S.E.2d 633 (2003).

**Personal Jurisdiction**

Tatonka argues that Mr. Connelly consented to personal jurisdiction in this Court despite the lack of "minimum contacts" by signing the Guaranty agreements. As stated above, the Guaranty agreements were not signed by plaintiff nor delivered to defendant and thus are not enforceable contracts.

**Laches**

In his answer, Mr. Connelly raised laches as an affirmative defense, alleging that even if Tatonka had an otherwise viable claim against him as guarantor, its substantial delay in asserting that claim unjustly prejudiced the defendants. Tatonka claims that there are no issues of fact with respect to that defense because there has been no showing that Mr. Connelly was damaged by the delay and, in any event, the suit was filed within the statute of limitations for contract claims.

In fact, "laches is available as a defense in some circumstances, even though the claim has been timely filed within a legislatively prescribed statute of limitations period" and has been so available "[s]ince the early days of statehood." *Hickerson v. Vessels*, 316 P.3d 620, 624 (Colo. 2014). Mr. Connelly engaged in good-faith negotiations with Tatonka for months with respect to Tatonka's efforts to acquire control of Mosaica, all the while Tatonka concealed its intent to bring this action if its efforts proved unsuccessful.

**Judicial Notice**

Relying on *Horton v. Davis,* Civil Action No. 13-cv-01089-REB-NYV, 2015 WL 7294815 (D. Colo. Nov. 19, 2055), Tatonka argues that this Court can take judicial notice of the court files and records from the Electronic Court ("ECF") system in the Receivership action in Georgia. That, of course, is true, but it means only that the Court can take judicial notice of the fact that a filing was made, not that it is true or that it is relevant to the instant proceeding. In other words, when a court takes judicial notice of documents, those documents may only be considered to show their contents, not to prove the truth of matters asserted therein. Tal v. Hogan, 453 F.3d, 1244, 1264 n.24 (10th Circuit 2006).

In *Horton,* this court found that it was not appropriate to take judicial notice of the truth of any facts included in the documents at issue in that case.. "Given that it is wholly unclear what facts Mr. Horton seeks to have the court accept as true 'to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed,'. . . this court respectfully declines to take judicial notice of the [documents in the related case file]." Like the plaintiff in the *Horton* case, it is unclear which facts Tatonka seeks to have this Court take judicial notice of.

The Court can, however, take judicial notice that (i) the defendants in this case were not parties in the Georgia case, (ii) Tatonka named corporate guarantors of Mosaica's obligations as additional defendants in the Receivership case but did not name Connelly or the Eidelmans; (iii) the Georgia court gave the approximately 75 Mosaica shareholders the right to hire counsel to assert claims on behalf of the Company (not on behalf of the individual shareholders), but refused to require the receiver to pay the lawyers; (iv) no one sought to enforce the defenses raised in the answer filed on behalf of Mosaica or to prosecute the counter-claims against Tatonka; and (v) no one, including the receiver and its counsel, challenged the amounts Tatonka claimed were owed by Mosaica or the amount outstanding at any time under the Revolver.

Statute of Frauds

Tatonka argues that the Colorado Credit Agreement Statute of Frauds bars the estoppel defense base on the email exchanges between Mosaica and Tatonka with

respect to the guaranties, but (i) the Colorado Credit Agreement Statute of Frauds doesn't apply here because Tatonka is not a "financial institution" as that term is defined in that statute, and (ii) in any event, the emails are writings that have nothing to do with the Statute of Frauds.

**Conclusion**

For the reasons set forth above, defendant Michael Connelly respectfully requests that Tatonka's motion for summary judgment be denied in its entirety, that Connelly's motion for summary judgment dismissing the complaint herein with prejudice be granted, for its costs incurred herein, and for such other and further relief as the Court deems proper.

Dated: November 27, 2017

Respectfully submitted,

By: /s/ *Michael J. Connelly*
Michael Connelly
425 Riverside Drive, Apt. 4K
New York, New York 10025
(917) 804-6304
michaeljconnellynyc@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, November 27, 2017, I filed the foregoing Answer and Counterclaim with the Clerk of the Court mailing a copy thereof by overnight delivery to:

Clerk of the Court
United States District Court
901 19th Street
Denver, CO 80294-3589

I served copies thereof on the parties by e-mailing copies to:

Denis H. Mark, Esq.
dmark@hamiltonfaatz.com

Reed F. Morris, Esq.
**rmorris@mlmw-law.com**

Gene Eidelman
gene.eidelman@gmail.com

Dawn Eidelman
ddeidelman@gmail.com

_____
Michael J. Connelly