**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 16-cv-01141-MSK-NYW

TATONKA CAPITAL CORPORATION,

      Plaintiff,

v.

MICHAEL CONNELLY,

      Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

**THIS MATTER** comes before the Court for findings of fact and conclusions of law following a two-day bench trial on December 5 and 6, 2018,[1] along with post-trial submissions **(#129, 130)** from the parties.

## JURISDICTION

The Court exercises jurisdiction pursuant to 18 U.S.C. §1332.

## FACTS

After consideration of the evidence presented, the Court makes the following findings of fact.

Between approximately 1998 and 2013, Mr. Connelly served as the Chief Executive Office of Mosaica Education ("Mosaica"), a business that built and operated charter schools around the world.  In 2007, Tatonka Capital Corporation ("Tatonka") agreed to lend funds to

---

[1]    Mr. Connelly appeared at the trial *pro se*, but he is an attorney and the Court treats him as a represented party.

Mosaica pursuant to the terms of a Revolver Loan and Security Agreement ("the Revolver"), essentially a line of credit secured by Mosaica's assets. The terms of the Revolver are complex and Mosaica's repayment obligations were highly variable depending on its cashflow. At a minimum, however, Mosaica was obligated to make monthly payments of accumulated interests on the sums remaining outstanding in the Revolver. For several years thereafter, Mosaica variously drew upon or made payments in accordance with the Revolver.

By 2013, Mosaica owed approximately $4.7 million on the Revolver. Mosaica continued to request additional funds from Tatonka, but by this point in time, Tatonka was of the opinion that Mosaica had "outstripped [its] borrowing capacity" relative to the value of its collateral. The record also reflects that Tatonka itself was experiencing a degree of cashflow problems, such that it was concerned that lending additional funds to Mosaica might affect its abilities to meet its commitments to other borrowers. Accordingly, Tatonka agreed to make certain "short-term advances" to Mosaica, in exchange for Mosaica's officers,[2] including Mr. Connelly, personally guaranteeing repayment of Mosaica's debts. The officers' guarantees are reflected in the form of a series of written Guaranty Agreements, and the meaning and intent of those agreements are at the core of the dispute in this case. The precise terms of the short-term advances are somewhat unclear from the record – the Guaranty Agreements seem to indicate that the short-term advances are made on and payable according to the same terms as the Revolver itself, but, as discussed below, there is some evidence that suggests that the short-term advances might mature and become repayable more quickly than other debts under the Revolver would.

---

[2] Claims by Tatonka against Mosaica officers other than Mr. Connelly have been discharged in those officers' personal bankruptcies. For purposes of efficiency, the Court will hereafter ignore the existence of those officers and their guarantees and refer only to Mr. Connelly.

The parties agree that Mosaica took out the first short-term advance, in the sum of $618,000, on February 7, 2013. On that same date, Mr. Connelly signed a Guaranty Agreement, which provides:

> To induce [Tatonka] to make loans to [Mosaica] upon the terms and subject to the conditions in the [Revolver] and for other good and valuable consideration . . . Michael Connelly hereby agrees as follows:
>
> 1. Guaranty: [Mr. Connelly] hereby, personally and unconditionally, (i) guarantees the due and punctual payment and performance of each of the Obligations of [Mosaica] under the [Revolver]. . . and (ii) agrees to indemnify, reimburse, and hold [Tatonka] harmless from any actual liability . . . suffered or incurred by [Tatonka] . . . resulting from, arising in connection with, or related to the transactions contemplated by the [Revolver].
>
> 2. Limitation: Notwithstanding any other provision in this Guaranty . . . [Mr. Connelly's] aggregate liability arising under this Guaranty . . . shall be limited to $ 618,000.

Thereafter, Mosica took out six more short-term advances, borrowing $500,000 in March 2013; $300,000 in April 2013; $750,000 in early May 2013; approximately $1.6 million in late May 2013; and $600,000 in August 2013, for a total of $4.369 million. In exchange for each advance, Mr. Connelly signed a separate Guaranty Agreement, each containing identical language as set forth above, the agreements differing only in the amount recited in the "Limitation" paragraph – each agreement's Limitation paragraph matched the amount being advanced by Tatonka in connection with that particular advance.

It is undisputed that Mosaica made at least $4.369 million in payments to Tatonka after February 7, 2013, and it is generally agreed by the parties that, to the extent that unique terms governed the repayment of the short-term advances, Mosaica fully complied with those terms. However, Mosaica failed to meaningfully reduce the total balance of the Revolver, and by 2014, it had fallen into default. Mosaica was forced into receivership proceedings in the Northern

District of Georgia in or about 2015.  In a June 2015 order, that court supervising the receivership concluded that Mosaica's debt under the Revolver was slightly more than $7.7 million.  Mosaica was ultimately liquidated and, following the sale of its assets, it remained indebted to Tatonka in the sum of approximately $5 million.

Tatonka then turned to Mr. Connelly's guarantee of Mosaica's debt.  Mr. Connelly took the position that, although the Guaranty Agreements purported to have him guarantee "each of the Obligations" of Mosaica (up to the total amount of the cumulative Guaranty Agreements), the parties' true intention was only to have Mr. Connelly guarantee Mosaica's repayment of the particular short-term advances.  Because those advances were repaid, Mr. Connelly argues, his guarantees were discharged and he owes nothing to Tatonka.  Tatonka contends that the Guaranty Agreements, as written, require Mr. Connelly to personally repay $4.369 million of Mosaica's remaining unpaid debt.

## ANALYSIS

Tatonka asserts a single claim for breach of contract under Colorado law against Mr. Connelly, based on his failure to pay the amounts owed by Mosaica.  Mr. Connelly asserts two affirmative defenses 1) the doctrine of mutual mistake – that the language of the Guaranty Agreements does not reflect the parties' mutual intentions regarding the transaction, warranting reformation – and 2) the doctrine applicable to a unilateral mistake.

### A.  Breach of contract

The Court begins with Tatonka's substantive claim for relief.  To establish a claim for breach of contract under Colorado law, Tatonka must show: (i) that an enforceable contract existed with Mr. Connelly, (ii) that Tatonka performed its obligations under the contract or that its performance was excused, (iii) Mr. Connelly did not perform his obligations, and (iv) Tatonka

suffered an injury as a result. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Putting aside Mr. Connelly's affirmative defenses, there is no meaningful dispute[3] that the Guaranty Agreements are binding contracts between Tatonka and Mr. Connelly. Similarly, there is no dispute that Tatonka performed as called for by the agreements by loaning the specified sums to Mosaica.

Mr. Connelly contends, however, that Tatonka has not established that he failed to perform his obligations under the agreements because "Tatonka has not claimed – much less proven – that any amount is owed under the Revolver." The evidence is to the contrary. Carol Hansen, Tatonka's President, testified that by the conclusion of the receivership proceedings, "approximately $5 million was still owed to Tatonka" by Mosaica. Tatonka also admitted Exhibit 36, its own accounting records of Mosaica's debt, to support this assertion. That assertion is also consistent with the court's findings in the receivership case that Mosaica owed Tatonka some $7 million dollars under the Revolver as of 2015 (before certain Mosaica assets were sold to satisfy some of this debt). In its closing argument, Tatonka fixed that figure at $4.312 million.[4] Mr. Connelly presented no evidence to the contrary.

Accordingly, the Court finds that Mosaica remains obligated to Tatonka in the sum of $4.312 million, the lowest figure urged by Tatonka. By operation of the Guaranty Agreements, Mr. Connelly was obligated to repay "each of the Obligations of [Mosaica] under the

---

[3] Mr. Connelly's post-trial brief argues that Tatonka's failure to sign the Guaranty Agreements amounts to a failure to demonstrate its acceptance of the agreements' terms. Mr. Connelly misread the paragraph he relies upon. Paragraph 20 of the agreements expressly provides that "the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Guaranty."

[4] The difference between that sum and the $5 million sum in Ms. Hansen's testimony is immaterial to the analysis herein.

[Revolver]," and it is undisputed that he has not done so.  There is no dispute that Tatonka was injured by Mr. Connelly's non-performance.  Thus, Tatonka has established its breach of contract claim against Mr. Connelly.

### B.  Affirmative Defense - Mutual mistake

Mr. Connelly's primary argument is that, notwithstanding the express language of the Guaranty Agreements, "the intent of the parties was that [the guarantors] would jointly ensure that Mosaica repaid the <u>short-term advances</u> when due."[5]  He seeks reformation of the Guarantee Agreements to conform to that understanding, and with such reformation a finding that he has not breached their terms.

Under Colorado law, when there is a <u>mutual</u> mistake of fact – *i.e.* where both parties' understanding of their agreement is contrary to the terms of a written instrument due to a drafting error, reformation of the written agreement to match the parties' intention is appropriate.  *See Segelke v. Kilmer*, 360 P.2d 423, 426 (Colo. 1961).  But if only one party misunderstood the effect of the written instrument – that is, where the mistake was <u>unilateral</u> – reformation is inappropriate and the contract is enforced according to its terms.  *Griego v. Kekkeler*, 543 P.2d 729, 730 (Colo.App. 1975); *Shoels v. Kelbold*, 375 F.3d 1054, 1066 (10th Cir. 2004), *but see discussion infra*.  The burden of proof is on the party seeking reformation to demonstrate the parties' mutual intent, and the evidence must "clearly and unequivocally show that reformation is appropriate."  *Cabs, Inc. v. Hartford Ins. Group*, 151 Fed.Appx. 604, 610 (10th Cir. 2005).

---

[5]     Implicit in this understanding is that the short-term indebtedness would be distinct from the Revolver indebtedness and that Mosaica could and did direct that specific payments be credited against the short-term indebtedness, rather than the Revolver indebtedness.  The Court discusses the evidence supporting this assumption below.

Mr. Connelly testified that "at no time did [he] understand that [he was] guaranteeing anything other than the repayment of that [particular short-term] advance." He testified that Ms. Hansen explained that Tatonka needed to ensure that it would be able to meet upcoming financial obligations to other borrowers as well, so it imposed the guarantees as a condition of making the short-term advances to ensure that those advances would be repaid promptly. Notably, Mr. Connelly emphasized that he had previously been a practicing lawyer for 8 years, in the private equity business for 17 years, and served as Mosaica's CEO for another 17 years. Given this experience, it is reasonable to assume that Mr. Connelly was well acquainted with written contracts and the need to read them carefully before execution, but he offered no explanation as to why he did not understand the plain language of the Guarantee Agreements or its failure to contain the terms upon which he thought the parties agreed. Nevertheless, because there is no evidence that Mr. Connelly ever manifested a different understanding during the parties' course of conduct, the Court finds that Mr. Connelly misunderstood the effect of the plain language of the Guaranty Agreements.

The more difficult question is whether Mr. Connelly has shown that Tatonka <u>shared</u> his misunderstanding. At trial, three representatives from Tatonka testified about the circumstances surrounding the short-term advances and the signing of the Guaranty Agreements: Jake Bauers, Tatonka's Chief Financial Officer; Ms. Hansen, Tatonka's President and Chief Executive Officer; and Eric Gorka, who was the "Account Lead" that worked with Mosaica on Tatonka's behalf. A detailed examination of each of their testimonies is warranted.

**Mr. Bauers' testimony**

Mr. Bauers testified that he was the Tatonka official responsible for preparing the Guaranty Agreements and representing Tatonka's position with regard to them. Mr. Bauers

testified on cross-examination that he had a single conversation with Mr. Connelly about the guarantees, in which Mr. Connelly "stated . . . that the guarantees were written incorrectly," and that Mr. Bauers responded that he believed they were "written correctly." The record is unclear as to what Mr. Connelly meant when he said that the guarantees were "written incorrectly" – specifically what aspect of the Guarantee Agreements was incorrect.[6]

(a)  Exhibit 58

On the date that Mr. Connelly signed the first guarantee (February 7, 2013),  Mr. Bauers sent him an email ( Exhibit 58) proposing different language for the Guaranty Agreement.  In the e-mail, Mr. Bauers proposes a change in terms of the "Limitations" paragraph in the Guaranty Agreement that would reduce the amount guaranteed from $618,000 to $308,000 if "the total outstanding on the [Revolver] is equal to or less than $4,720,000" on a particular date, and would void the guarantees entirely if the balance on the Revolver fell below $3,285,000 by another particular date.  This proposal appears to have been made in response to certain concerns expressed by Mr. Connelly, but no witness ever testified about what those concerns were.  Mr. Bauers testified, and Mr. Connelly did not dispute, that Mr. Connelly responded to the e-mail. Instead, on the same date, Mr. Connelly executed the Guaranty Agreement without modification, and subsequently signed additional Guaranty Agreements, again without requesting any modification.

The Court is hard-pressed to draw any firm conclusions from the discussion of Exhibit 58.  It is clear that Mr. Bauers and Mr. Connelly had some discussion about the issue of when

---

[6]      The predicate of a question posed by Mr. Connelly when examining Mr. Bauers suggests that Mr. Connelly contends that the discussion concerned "a possibility that the guarantee might be argued to survive the repayment of the short-term advances," but Mr. Bauers denied having any recall of such a discussion and Mr. Connelly did not address the issue in his own testimony.

and how the guarantees would expire and the interrelationship of the Revolver and short-term indebtedness. It is also fair to assume that, based on their own self-interests, Mr. Connelly would want the guarantees to be limited to the short-term advances and payments applied to such advances; in contrast, Tatonka would want the guarantees to cover as much of Mosaica's accumulated indebtedness as possible. Read with the preceding paragraph in the Guaranty Agreement, under which Mr. Connelly was obligated to guarantee all of Mosaica's indebtedness, the proposed language limited the amount of Mr. Connelly's guarantee based on the balance of the Revolver indebtedness. At least one interpretation of this proposed language in the context of discussions between Mr. Connelly and Mr. Bauers is that Tatonka viewed the proposal as a concession to Mr. Connelly by reducing his exposure as a guarantor of all of Mosaica's debt including the Revolver debt. That interpretation suggests that, consistent with the plain language of the Guaranty Agreement, Tatonka viewed the guarantees as being applicable to the entirely of Mosaica's debt regardless of whether it was owed as a short-term extension or on the Revolver. Another interpretation might be that Tatonka intended the guarantee to be limited to the short-term advances and the proposal reduced the amount of the guarantee because the advances were included in and made a part of the Revolver loan. Unfortunately, the evidence presented does not confirm either possibility and the Court makes no particular findings regarding the meaning of Exhibit 58.

      (b) <u>Exhibit 51</u>

Mr. Connelly cross-examined Mr. Bauers about Exhibit 51, a March 13, 2013 e-mail from Rita Chapin, Mosaica's CFO, to Mr. Bauers. In that e-mail, Ms. Chapin authorizes Tatonka to credit certain funds in a bank account as a payment on Mosaica's indebtedness to Tatonka. Specifically, Ms. Chapin refers to two amounts: "the $308,000 advanced to Mosaica

on February 7 and the $345,000 advanced to Mosaica on March 8."[7]  Ms. Chapin notes that these payments are "in satisfaction of the guarantees of" Mr. Connelly and the other Mosaica officials. Mr. Bauers responded to the e-mail by noting that Mosaica also needed to make "the normal monthly payments as well," to which Ms. Chapin replied in agreement, but did not comment upon the "in satisfaction of the guarantees" language in any way.  In his testimony, Mr. Bauers seemed to acknowledge that he understood that Ms. Chapin had a misunderstanding about how the guarantees worked, but he testified he felt that he "ha[d] no obligation to correct her" and did not.  Similarly, Exhibit 61 is an e-mail from Mr. Connelly to Mr. Bauers, dated April 12, 2013, authorizing Tatonka to take $300,000 from the bank account "in repayment of [funds] advanced earlier this week and in satisfaction of [ ] my guarantee thereof."   Mr. Bauers did not respond to the "satisfaction" language in this e-mail either.

In response to questions posed by the Court, Mr. Bauers testified that there was no way for Mosaica to apply a particular payment so as to specifically pay off a particular short-term advance.  He explained that the short-term advances "were part of a promissory note" – apparently, the Revolver -- and that "the advanced sums weren't their own individual advance. They were part of a large loan of which the balance could go up with advances and go down with repayments."  Thus, payments "would have been applied to the aggregate balance of that [Revolver]" according to a "waterfall" algorithm that would allocate the payment to various categories such as outstanding balances, interest, and principal.  But Mr. Bauers' testimony on this point is somewhat in conflict with the e-mails in which Mosaica specifically indicates that it

---

[7]     The Court has some difficulty correlating these amounts to the sums and dates of the short-term advances otherwise reflected in the Guaranty Agreements themselves.  The Court will assume that the guarantees captured some, but not all, of the lending that Tatonka was doing to Mosaica at this time.

is tendering payments to pay off specific short-term advances. This is particularly notable in Exhibit 51: there, Mosaica authorized a payment of more than $650,000 to Tatonka, purportedly to pay off specific short-term advances. If Mr. Bauers' testimony was correct, Tatonka would take that $650,000 and allocate it to the whole of Mosaica's various debts according to the waterfall formula, paying down interest and principal on the Revolver as a whole. But instead, Mr. Bauers responded by asking Mosaica to make "the normal monthly payment" as well. This suggests that Mr. Bauers understood and agreed that the $650,000 payment being directed towards something other than the "normal monthly" obligations of Mosaica under the Revolver, and that it would not be credited against those "normal monthly" payment amounts.

This and other testimony also suggests that the "short-term advances" were not simply additions to the balance due on the Revolver – and thus subject to the Revolver's own repayment terms and maturity dates -- but rather individual loans with their own unique maturity dates. Exhibit 60, for example, is an e-mail from Mr. Gorka to Mr. Connelly, discussing "a new $140k advance today with a shorter maturity date." If each short-term advance had its own maturity date, it would be incumbent upon Tatonka to separate those advances from the debt owed under the Revolver (which would likely have different maturity dates), so as to allow Tatonka to determine whether a given advance had been repaid as scheduled. It would also be necessary for Tatonka to determine whether payments were being directed at the Revolver or a specific advance, contrary to Mr. Bauers' testimony that Tatonka did not do so. Thus, the Court does not credit Mr. Bauers' testimony that the short-term advances and the Revolver were, by necessity, aggregated and accounted for jointly with all of Mosaica's other accumulated debt; rather, the record reflects that Tatonka could and did allocate specific payments towards satisfying the obligations resulting from specific short-term advances.

### Ms. Hansen's testimony

Much of Ms. Hansen's testimony was either duplicative of Mr. Bauers' testimony or addressed subjects that are not germane here. However, Ms. Hansen did give some testimony about Exhibit 56 that supports Tatonka's position in this matter. In January 2013, Tatonka prepared versions of the Guaranty Agreements that indicated that the Mosaica officials would be guaranteeing a total of more that $1.4 million, far above what Tatonka was apparently then offering as a short-term advance (*i.e.* the $618,000 advance in February 2013). A Mosaica official e-mailed Tatonka explaining that these amounts "were obviously incorrect" and proposed giving a guaranty in the same amount as the short-term advance being contemplated. Tatonka ultimately agreed. Mr. Connelly interprets this evidence to support his argument that the guarantees were linked only to the short-term advances. But the Court construes the evidence to demonstrate something else as well. Ms. Hansen testified that the purpose of seeking the $1.4 million in guarantees was because Tatonka was "looking for global solutions [because] the amount that was extended to Mosaica had gone beyond our normal course of business lending relationship." In other words, Ms. Hansen's testimony confirms that as of January 2013, Tatonka's intention was to have Mr. Connelly guarantee repayment of some degree of "antecedent debt" already included in the balance of the Revolver, not simply guarantee repayment of the short-term advances the parties were discussing. Although Mr. Connelly objected to a guarantee of that size and Ms. Hansen ultimately agreed to reduce the guarantee to match the amounts of the short-term advances, this Court does not find that Tatonka's goal – further collateralizing the antecedent debt in the Revolver via the Guaranty Agreements – changed at the same time. In other words, Ms. Hansen's testimony and Exhibit 56 are consistent with the contention that Tatonka's intention was always to have the Guaranty

Agreements secure repayment of the accumulated debt in the Revolver, not just repayment of the short-term advances.

### Mr. Gorka's testimony

Finally, Mr. Gorka testified that, as of 2013, his recollection was that "the documents had a threshold or a minimum balance where once something was advanced, it had to be repaid to that balance and the guarantees would be released" – in other words, that Mosaica's repayment of the short-term advances alone would release and void the guarantees. Mr. Gorka also addressed Exhibit 53, an e-mail he sent to Mr. Connelly in July 2014 where Mr. Gorka stated "I am confident that there are no personal guarantees from [the Mosaica officials] relating to the short term advances or other loan documents. [Mr. Bauers] is reviewing the documents to make certain that they reflect the agreements and that the short term advances have all been paid. I believe that they have, but just making sure." Mr. Gorka explained that the e-mail correctly reflected his understanding of the situation but that Mr. Bauers "was managing that process, I had been removed from that process and was working on other things. And so . . . I had to talk to [Mr. Bauers]." In discussing the issue with Mr. Bauers, Mr. Gorka learned that his own understanding of the guarantees was incorrect. Mr. Gorka conceded that he never contacted any of the Mosaica officials thereafter to advise them that his (and their) understanding of the guarantees was incorrect. Indeed, it appears to be undisputed that no one from Tatonka advised Mr. Connelly or the other Mosaica officials about Tatonka's belief that the guarantees remained extant until Tatonka commenced this litigation in 2016.

Mr. Gorka also testified briefly about a conversation he had with Mr. Connelly on February 7, 2013 about the "approach that [Mr. Bauers] was taking with the guarantees." Mr. Gorka testified that Mr. Connelly told him that he was dissatisfied with the language of the

guarantees.  On re-cross, Tatonka's counsel asked Mr. Gorka about that discussion, specifically "during this discussion with Mr. Connelly that you had on February 7, did Mr. Connelly express to you that he understood that there was an issue regarding whether the short-term advances – the guaranty agreements would be satisfied with repayment only of the short-term advances?"  Mr. Gorka responded "Yes."

**Analysis**

Based on these facts, the Court cannot conclude that Mr. Connelly has carried his burden of showing, by "clear and unequivocal" evidence, that he and Tatonka both had a mistaken impression as to how the Guaranty Agreements would work.  Although Mr. Connelly understood that the guarantees would be discharged upon payment of the short-term advances, the Court cannot say – and certainly not by the heightened evidentiary burden Mr. Connelly must carry – that Tatonka shared that understanding.  It may be that Mr. Gorka, who had become Mr. Connelly's close friend, shared Mr. Connelly's perspective about the guarantees, but the evidence is clear that Mr. Bauers was the designated agent for Tatonka with regard to the Guaranty Agreements.  And for the reasons set forth above, the Court finds that Mr. Bauers did not share Mr. Connely and Mr. Gorka's understanding of those agreements.  There is sufficient evidence from both Mr. Bauers and Ms. Hansen to indicate that Tatonka intended the Guaranty Agreements to apply as written – that is, to guarantee the repayment of antecedent debt on the Revolver, not simply the repayment of the short-term advances themselves.  Ms. Hansen's testimony and Exhibit 56 indicate that Tatonka intended the guarantees to secure more than the amounts of the short-term advances, and nothing in the record suggests that, by agreeing to change the amounts called for in the guarantees, Tatonka was changing its intention as to what

indebtedness would be secured by the guarantees. Accordingly, the Court finds against Mr. Connelly on his defense of mutual mistake.

### C. Unilateral mistake

Mr. Connelly argues that, in the absence of a mutual mistake, he is still entitled to reformation of the Guaranty Agreements under the doctrine of unilateral mistake.

(a) <u>Whether reformation is available for unilateral mistakes</u>

The Colorado Supreme Court has not squarely addressed the question of whether a contracting party can seek reformation based on a unilateral mistake in the circumstances presented here. Neither party has requested certification of a question to the Colorado Supreme Court. Consequently, it is the Court's obligation to attempt to predict how the Colorado Supreme Court would rule if presented with the issues in this case. *Shoels v. Klebold*, 375 F.3d 1054, 1068 (10th Cir. 2004).

It is generally understood that contracts can be reformed based on mutual mistakes, but that unilateral mistakes do not permit reformation. *See e.g. Griego v. Kokkeler*, 543 P.2d 729, 730 (Colo.App. 1975). However, on at least three occasions, the Colorado Supreme Court appears to have acknowledged an exception to that rule: that a unilateral mistake by one party to a contract can permit reformation if the evidence demonstrates that, at the time the contract was formed, the non-mistaken party was aware of the mistaken party's mistake. First, in *Jackson Enterprises, Inc. v. Maguire*, 355 P.2d 540, 543 (Colo. 1960), an individual named Carlson offered to exchange real property she owned in Illinois for the plaintiff's motel in Colorado. Due to some confusion, the parties' written contract listed Carlson's home as one of the parcels being exchanged, when, in fact, Carlson intended only to convey certain commercial parcels. The trial court found the inclusion of the residence in the conveyance to be a mutual mistake and reformed

15

the contract.  On appeal, the plaintiff argued that it fully intended to obtain the residence, and that Carlson's mistake was, at most, a unilateral one.  Without specifically resolving the question of whether the mistake was mutual or unilateral, the Colorado Supreme Court affirmed the reformation of the contract.  It explained that Carlson "brought to the attention of the [plaintiff] that she had no intention to transfer her home, but the [plaintiff] nevertheless included its legal description in the deeds it prepared" and which Carlson signed.  In such circumstances, the Supreme Court endorsed the trial court's application of "the principle that one party cannot knowingly take advantage of the mistake of the other party to the contract."

Two decades later, in *In re Marriage of Manzo*, 659 P.2d 669 (Colo. 1983), the Colorado Supreme Court considered a property separation agreement in a domestic relations matter.  The husband had agreed to a disposition that granted the wife the first $60,000 from the sale of the marital home, believing that the property's sale value was around $140,000.  When the house was actually put up for sale, it was expected to sell for only $100,000.  The husband petitioned to set aside the agreement on the grounds of unconscionability, and the trial court granted that motion.  On appeal, the Supreme Court reversed.  The vast majority of the court's analysis is focused on the interpretation of statutory provisions regarding unconscionable property settlement agreements under the Uniform Marriage and Divorce Act and is therefore irrelevant to the determination herein.  The only pertinent portion of *Manzo* is the court's passing comment that "traditionally, a contract may not be rescinded because one party has made a unilateral mistake as to value <u>unless the other party knew or had reason to know of the error</u>."  *Id.* at 672 (emphasis added), *citing* J. Calamari and J. Perillo, <u>Contracts</u>, § 9-27 at 306 (2d Ed. 1977).

Finally, the Colorado Supreme Court decided *Powder Horn Constructors, Inc. v. City of Florence*, 754 P.2d 356, 364 & n. 7 (Colo. 1988).  There, a municipality that had solicited sealed

bids for a city construction project. Powder Horn was the lowest bidder on the project by about $50,000. The day after the bids were opened, the city contacted Powder Horn and informed it that its calculations included a possible mistake, inviting Powder Horn to review its bid. Powder Horn did so, and noticed that it had omitted a $66,000 charge from its final calculations. It advised the city that, due to the mistake, it was withdrawing its bid. However, several days later, the city accepted the original bid, and when Powder Horn refused to accept the award of the contract, the city filed suit against it seeking to enforce the bid as tendered (or to cause Powder Horn to forfeit its bid bond). The trial and appeals courts found that Powder Horn's mistake was unilateral, such that the city's acceptance of the mistaken bid did not warrant reformation in Powder Horn's favor. But the Colorado Supreme Court held that "under certain circumstances, a bidder submitting a bid for a public construction project may be permitted to rescind the bid prior to its acceptance if it reflects a material mistake of fact," and that "the exercise of reasonable care is [not] an appropriate factor upon which to condition this right of rescission." 754 P.2d at 358-59. Most of the analysis in *Powder Horn* concerned the peculiar public policy considerations that relate to mistakes made in the public bidding process. However, in a footnote, the Supreme Court pondered the Court of Appeals' characterization of Powder Horn's mistake as a "unilateral" one. After musing briefly about whether "the classification of a mistake as unilateral or mutual" was a particularly helpful one, the court noted that "the Restatement . . . states that where a mistake of one party occurs as to a basic assumption the contract is voidable only if enforcement of the contract would be unconscionable or the other party had reason to know of the mistake." It noted that these requirements "assist[ ] in ensuring that avoidance of the contract will not unreasonably disappoint the expectations of the party not causing the

mistake." And it noted that "in this case the evidence indicates the city's representative was aware of the probability that a mistake had been made . . . ." *Id.* at 364 n. 7.

Although at least *Manzo* and *Powder Horn* express the concept in non-binding dicta, it appears to this Court that the Colorado Supreme Court has repeatedly endorsed the notion that a contracting party's unilateral mistake about a material fact, coupled with the non-mistaken party's awareness of that mistake, can justify reformation of the parties' contract. Lower courts applying Colorado law have also acknowledged that same principle, albeit sometimes in dicta as well. *See e.g. Shoels v. Klebold*, 375 F.3d 1054, 1068 (10th Cir. 2004) (*citing Powder Horn* for the proposition that Colorado law "allows relief only if the mistakenly entered contract was unconscionable or the defendant knew or had reason to know of the mistake," but finding that the non-mistaken party there was not aware of the mistake); *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 135-36 (Colo.App. 2009) (stating in dicta – or perhaps as a "hold[ing] in the alternative" – that a material unilateral mistake by one party, if known to be such by the opposing party, allows the mistaken party to void the ensuing contract).

The primary case to the contrary is *Poly Trucking v. Concentra Heath Services, Inc.*, 93 P.3d 561, 566 (Colo.App. 2004). There, a commercial truck driver caused an accident after suffering a seizure. Poly, the trucking firm employing the driver, sued Concentra, the entity that had certified the truck's driver as safe, contending that Concentra was responsible for negligence of its employees, namely the doctors who certified the driver. The parties negotiated a settlement between Poly and Concentra, but in the course of exchanging drafts of a settlement agreement, Concentra accidentally omitted language it had previously tendered that released claims against both itself and its doctors. The final version of the agreement released only Poly's claims against Concentra itself. After the settlement was approved, Poly brought suit against the

18

doctors and Concentra sought to have the settlement agreement reformed due to a unilateral mistake. The trial court reformed the agreement, but the Court of Appeals reversed. It recited the general rule that reformation due to a unilateral mistake is appropriate where "the other [party] engaged in fraud or inequitable conduct," but "where a party's unilateral mistake is the result not of fraud, but of its own failure to use due diligence in reading the contract before signing it, that party will be held to the terms." *Id.* at 563. The court agreed that Concentra had mistakenly failed to ensure that the agreement released its doctors, but found that, according to the criteria found in Section 551 of the Restatement of Contracts (defining the circumstances in which a party has a duty to disclose facts to another in a business transaction), Poly had not committed fraud by failing to inform Concentra of its intent to sue the doctors or the fact that Concentra had inadvertently omitted the language releasing the doctors from subsequent drafts of the settlement agreement. The court was particularly persuaded by the facts that the parties were in an adversarial, not fiduciary, posture and that Poly was only accused of engaging in silence about Concentra's error, not that Poly had made any affirmative misleading statement or otherwise engaged in any inequitable conduct. Although it was unclear whether the court found that Poly was aware of Concentra's error at the time, it appeared to believe that such knowledge would not matter: "Concentra's arguments to the contrary notwithstanding, even if Poly had been cognizant of Concentra's intent to obtain a release of the doctors, it was for Concentra to protect its own interests." *Id.* at 566. The Court also rejected, as factually distinguishable, Concentra's "out-of-state cases for the proposition that inequitable conduct includes knowledge by one party of another's mistake." *Id.*

Based upon this Court's review of Colorado law, the Court concludes that *Poly Trucking* stands as the exception, and that the general line of authority – including three separate

statements by the Colorado Supreme Court – reflect the prevailing rule in the state: that a unilateral mistake can warrant reformation if the other side was aware of that mistake at the time of contract formation. Among other things, *Poly Trucking*'s focus on the mistaken party's degree of fault or culpability seems to conflict with *Powder Horn*'s astute observation that "the very term 'mistake' generally connotes some degree of negligent conduct" by the mistaken party and its conclusion that "the question of the availability of equitable relief from a mistaken [agreement] should focus primarily on the consequences of the mistake," not on "the cause of the mistake." 745 P.2d at 361-62. Moreover, *Poly Trucking* gives short shrift to the issue presented here – whether the non-mistaken party's knowledge of the mistake bears on the court's power in equity to grant reformation. The sole authority that *Poly* relies upon to reject the notion that Poly's knowledge of Concentra's mistake would be of analytical significance, *Ingels v. Ingels*, 487 P.2d 812 (Colo.App. 1971), does not address a situation where one party knew of the other's mistake. Accordingly, forced to predict how the Colorado Supreme Court would address the circumstances of this case, this Court concludes that it would adopt the principles endorsed in *Powder Horn* and other cases, allowing Mr. Connelly to seek reformation of the Guaranty Agreements if he demonstrates[8] his own unilateral mistake plus Tatonka's knowledge of that mistake.

### Standards

---

[8]    The Court is aware of no caselaw that clearly apportions and quantifies the burden of proof in underlined unilateral mistake cases. It appears logical that the burden would be similar to that imposed in underlined mutual mistake cases – that is, that Mr. Connelly bears the burden of proof and must establish the pertinent facts by clear and convincing evidence. *Accord Jackson Enterprises*, 355 P.2d at 542 (noting that reformation is a remedy that requires an "extraordinary showing" of clear and convincing proof).

Both *Powder Horn* and *Sumerel* endorse the application of principles found at Section 153 of the Restatement (Second) of Contracts (as well as related sections clarifying that rule).

Section 153 provides that "where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him" if two facts are present. First, the other party (*i.e.* the plaintiff seeking to enforce the contract) must have "had reason to know of the mistake." Second, the plaintiff must "bear[ ] the risk of the mistake" under the principles in Section 154 of the Restatement. Section 154 states that a party bears the risk of mistake under various circumstances, the most pertinent here being that the risk may be "allocated to [that party] by the court on the ground that it is reasonable under the circumstances to do so." Comment f to Section 153 notes that it would be "unusual for a party to bear the risk of a mistake that the other party had reason to know of."

In circumstances where the non-mistaken party "actually knew" of the mistake, Section 153 directs the Court to several additional provisions of the Restatement, falling within the general rubric of "Misrepresentation." Section 161 provides that "a party's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist" in certain circumstances, including "where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or part." Comment e to Section 161 explains that "one party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation." This comment also makes clear that "the failure of a party to use care in reading the writing so as to discover the mistake may not preclude such relief" unless the

negligent party was not acting in good faith. *Citing* Section 172 ("A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith"); *see also* Restatement Section 157; *Powder Horn*, 754 P.2d at 361.

Illustration 12 to Section 161 is germane here. It posits a situation in which A offers to buy a tract of land from B for the sum of $100,000. B mistakenly thinks that the offer includes an agreement by A to assume an existing mortgage. A knows of B's mistake but also knows that the offer does not include such a term and does not disclose that knowledge to B. B signs an integrated agreement that does not contain a provision for A to assume the mortgage. The Restatement makes clear that "A's non-disclosure is equivalent to an assertion that the writing contains [the mortgage-assumption] provision, and this assertion is a misrepresentation." The illustration directs the reader to Section 164 of the Restatement to determine whether "the contract is voidable by B" in such circumstances. Section 164 explains that if the mistaken party's assent to the contract "is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."

### Analysis

Applying these principles to the instant facts, the Court has previously found that Mr. Connelly had a mistaken understanding of the Guaranty Agreements he signed: he subjectively believed them to guarantee only Mosaica's repayment of the particular short-term advance with which they were associated. Although this misunderstanding was the result of Mr. Connelly's own negligence in failing to adequately review and evaluate the plain language of the Guaranty Agreements, the Court cannot conclude that Mr. Connelly's misunderstanding was made by him

in bad faith. Mr. Gorka had been having discussions with Mr. Connelly about the guarantees and seemed to share Mr. Connelly's mistaken understanding about what the Guaranty Agreements actually required. As late as the same date that the first Guaranty Agreement was signed, Tatonka had proposed additional language to the agreements that would also be somewhat consistent with Mr. Connelly's position here. Thus, although the Court finds that Mr. Connelly is solely responsible for misunderstanding the legal effect of the Guaranty Agreements' language, it also finds that Mr. Connelly's misunderstanding was nevertheless one that he reached in good faith under Section 172 of the Restatement.

Next, the Court turns to whether and when Tatonka became aware of Mr. Connelly's misunderstanding. The Court finds that Ms. Chapin's March 14, 2013 e-mail (Exhibit 51), was the first point in time at which Tatonka had unambiguous evidence that the Mosaica officials mistakenly understood the Guaranty Agreements to be "satisf[ied]" by the repayment of the corresponding short-term advances. Prior to that date, the record only reflects vague discussions between Mr. Connelly and Mr. Gorka or Mr. Bauers about the <u>possibility</u> that the Guaranty Agreements could be structured to terminate the guarantees upon repayment of the short-term advances. The final act in those negotiations – Mr. Connelly signing the first Guaranty Agreement as written – could have been understood by Tatonka to constitute Mr. Connelly accepting the broad guarantee language contained in the agreement, and Tatonka could reasonably expect that Mr. Connelly, an experienced lawyer and businessman, intended to comply with the agreement's plain language.

Ms. Chapin's March 14, 2013 e-mail, however, clearly informed Tatonka that Mr. Connelly had a different understanding the agreement and that he believed the repayment of the short-term advance had the effect of nullifying the guarantee. Mr. Bauers did not testify that he

misunderstood the meaning or intent of Ms. Chapin's references to "satisfaction" of the guarantees. Indeed, when Mr. Connelly asked him at trial whether "you knew that she thought that these monies were being used to satisfy the outstanding guaranty, and you did nothing to correct her?," Mr. Bauers did not deny the predicate of the question – that he knew Ms. Chapin thought the payment satisfied the guarantees. He merely stated that he "ha[d] no obligation to correct her." Accordingly, the Court finds that Tatonka knew as of March 14, 2013 that Mr. Connelly had a misunderstanding about the effect of the Guaranty Agreements. The record also unambiguously reflects that, despite that understanding, Tatonka chose to remain silent about that misunderstanding instead of correcting it.

Under these circumstances – and with the exception discussed in the note below – the Court finds that Tatonka knew of Mr. Connelly's mistaken understanding of the effect of the Guaranty Agreements, and that Tatonka's silence and refusal to correct Mr. Connelly's misunderstanding constitutes a misrepresentation to Mr. Connelly about the effect of the Guaranty Agreements under Restatement Section 161 and illustration 12. The same facts – Tatonka's knowledge of Mr. Connelly's mistaken understanding of the Guaranty Agreements and its refusal to correct that misunderstanding – also warrant the Court finding that Tatonka bears the risk of mistake under Section 154 of the Restatement. Notably, consistent with *Powder Horn*'s emphasis on the preserving the parties' reasonable expectations, the Court observes that Tatonka received exactly what it knew that Mr. Connelly intended to promise: prompt repayment of the short-term obligations. There is no dispute that Mosaica paid those advances back as scheduled. Tatonka's further expectation that the Guaranty Agreements would also secure repayment of antecedent debt already in the Revolver was unreasonable, given its knowledge that Mr. Connelly did not understand the agreement to have such an effect. Tatonka did not take

24

the position at trial that, had it understood the Guaranty Agreements to secure only the short-term advances, it would have charged a higher interest rate on them or otherwise acted any differently than it did. Thus, it is reasonable under the circumstances to place the risk of a mistake in the interpretation of the Guaranty Agreements on Tatonka, the party who knew of Mr. Connelly's mistake and chose to ignore (or perhaps even capitalize on) it, rather than on Mr. Connelly himself.

But these findings lead to the question of whether the Guaranty Agreements are ultimately voidable under Restatement Section 164 (or, for that matter, appropriate for reformation). Mr. Connelly must show that Tatonka's "misrepresentation" – that the Guaranty Agreement would guarantee only the short-term advances – induced him to enter into those agreements or that he relied upon that misrepresentation in some way. The purpose of such a requirement is obvious: if Mr. Connelly would have agreed to the guarantees even knowing their true effect, he can hardly claim any prejudice from his mistaken understanding of them.

Mr. Connelly never testified that he would not have signed the Guaranty Agreements had he known that they also guaranteed his repayment of a portion of the Revolver debt so long as any of it existed. This omission is particularly significant given that Mr. Connelly is an attorney and that he bears the burden of proof of this fact by clear and convincing evidence. There is evidence in the record that Mosaica was especially desperate for funding in 2013, as Mr. Connelly testified that it agreed to take out the short-term advances even though those advances were "especially expensive." And Exhibit 58 indicates that Tatonka proposed a guaranty that would specifically terminate upon specified conditions, but the undisputed testimony is that Mr. Connelly rejected that proposal and instead agreed to language that had no fixed terms for the termination of the his personal guarantees. Thus, there is at least some reason to believe that Mr.

Connelly might have been willing to sign the guarantees, regardless of whether they applied to antecedent debt or not, simply to preserve the flow of needed capital into Mosaica. When juxtaposed against the complete absence of evidence by Mr. Connelly to the contrary, and with the imposing burden of proof he bears, the Court is compelled to find that Mr. Connelly has not shown that he acted in reliance upon his mistaken understanding of the Guaranty Agreements when he signed them. Under such circumstances, relief in the form of voiding or reforming the agreements is not appropriate.

Accordingly, the Court finds that Mr. Connelly did not prove all of the required elements for his defense of unilateral mistake.[9]

### D. Remedy

Because Tatonka has proven its claim for breach of contract, and Mr. Connelly has not adequately proven his affirmative defenses, the Court enters judgment in favor of Tatonka. The parties agree that the total amount guaranteed by Mr. Connelly under the various Guaranty Agreements is $4.369 million, but Tatonka concedes that Mosaica's total remaining indebtedness

---

[9] Even if Mr. Connelly had established the elements for unilateral mistake, the Court would find that such a mistake was first known to Tatonka on March 14, 2013, when Ms. Chapin informed Tatonka that the repayment of the first short-term advance "satisf[ied]" the Guaranty Agreements. Prior to that date, Tatonka had no clear reason to assume that Mr. Connelly – an experienced attorney and businessman – had misunderstood the plain language of the agreements. And the Restatement is clear that reformation of a contract is appropriate only if the non-mistaken party was aware of the mistake at the time of contract formation. Thus, the Court would hold that Mr. Connelly remains liable to Tatonka on any Guaranty Agreements signed prior to March 14, 2013. The first agreement, signed on February 7, 2013 in the amount of $618,00 meets this criteria, and thus, the Court would enter judgment in favor of Tatonka on this sum regardless of Mr. Connelly's success on his defense of unilateral mistake in all other respects. In addition, as discussed herein, the Court would also assess prejudgment interest on that sum, consistent with the terms of the Revolver Agreement, from the date Tatonka commenced this action in 2016 until the date of this Order, amounting to roughly $550,000 in interest.

is only $4,312,000. Thus, the Court will enter judgment in favor of Tatonka on this principal sum.

Tatonka also requests prejudgment interest. Colorado law requires such interest to be included in a judgment whenever a defendant has "wrongfully withheld" payment of funds it owes to the plaintiff. *See e.g. Personnel Dept., Inc. v. Professional Staff Leasing Corp.*, 297 Fed.Appx. 773, 789-90 (10th Cir. 2008), *citing* C.R.S. § 5-12-102(1)(a). Under C.R.S. § 5-12-102(4)(a), the appropriate rate for prejudgment interest is either 8% or the amount agreed upon by the parties in a written instrument that provides for the payment of interest at a specified rate. Here, the Revolver agreement, whose terms are incorporated by reference into the Guaranty Agreements, provides that interest on unpaid sums shall accrue at an annual rate of 18%. In the absence of a provision for compounding of that interest, the Court will treat that as simple interest. Divided over a 12 month period, that 18% interest rate is equivalent to 1.5% per month, or $64,680 on a principal sum of $4,312,000.

The parties appear to agree that Tatonka did not make demand upon Mr. Connelly to honor his Guaranty Agreement until 2016, when this action was commenced. Because Tatonka did not call upon Mr. Connelly to honor his guarantees until that date, the Court cannot conclude that Mr. Connelly "wrongfully withheld" payment to Tatonka prior to that date for prejudgment interest purposes. Thus, prejudgment interest shall run from May 2016, when this action was commenced, until May 2019, the approximate date of entry of judgment herein, a period of 60 months. At the rate of $64,680 per month, that sum comes to $3,888,080. Thus, the amount owed by Mosaica is a combination of principal and interest - ($4,312,000 + $3,888,080) or $8,192,800.

## CONCLUSION

For the foregoing reasons, the Clerk of the Court shall enter judgment in favor of Tatonka on its claim against Mr. Connelly, in the sum of $8,192,800, to bear post-judgment interest at the rate set by Colorado law. There being no remaining matters to address against any remaining Defendants, the Clerk of the Court shall close this case.

Dated this 20th day of May, 2019.

**BY THE COURT:**

_Marcia S. Krieger_
_____
Marcia S. Krieger
Senior United States District Judge