# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 16-cv-01141-MSK-NYW

**TATONKA CAPITAL CORPORATION,**

    Plaintiff,

v.

**MICHAEL CONNELLY,**

    Defendant.

_____

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION
_____

**THIS MATTER** comes before the Court pursuant to Mr. Connelly's Motion for Reconsideration **(# 134)** of certain portions of the Court's May 20, 2019 Findings of Fact and Conclusions of Law ("Findings and Conclusions") **(# 131)** and Judgment **(# 132)**, Tatonka's response **(# 135)**, and Mr. Connelly's reply **(# 136)**.

## FACTS

The Court assumes the reader's familiarity with the Findings and Conclusions and the contents of that document are deemed incorporated herein. In summary, following a bench trial, the Court concluded that Mr. Connelly had breached contractual promises to Tatonka to personally guarantee certain loans that Tatonka made to Mosaica Education ("Mosaica"), upon which Mosaica eventually defaulted. Mr. Connelly tendered affirmative defenses seeking reformation of the guarantees, arguing that either Tatonka shared his mistaken understanding that the guarantees would only secure certain short-term loans that Mosaica eventually repaid (*i.e.* a defense of mutual mistake) or that Tatonka was aware of Mr. Connelly's mistaken understanding

1

of the guarantees but that Tatonka purposefully remained silent and allowed Mr. Connelly to act in reliance upon that mistaken understanding (*i.e.* a defense of unilateral mistake). The Court rejected Mr. Connell's mutual mistake defense, finding that Mr. Connelly had not shown that decision-making officials at Tatonka shared his mistaken understanding of the guarantees, and rejected his defense of unilateral mistake because Mr. Connelly had not shown that he would not have entered into the guarantees if Tatonka had disclosed its contrary understanding of their effect. Accordingly, the Court entered judgment in favor of Tatonka for breach of contract on all of the guarantees, awarding it roughly $8 million in principal and interest.

Mr. Connelly now moves **(# 134)** for reconsideration of the Court's findings and conclusions. Mr. Connelly argues: (i) that Tatonka failed to prove that it accepted Mr. Connelly's guarantees because it failed to countersign those guarantees, thus reflecting its acceptance of his offer, and that the Court erred in relying upon a provision in the guarantees that the failure of Tatonka to sign the guarantees would not affect their validity; (ii) that Tatonka had failed to prove that Mosaica remained indebted to Tatonka under the "Revolver" agreement that Mr. Connelly's guarantees secured; and (iii) that the Court erred in requiring Mr. Connelly to prove that he would not have entered into the guarantees if Tatonka had promptly disclosed its understanding of their effect. Mr. Connelly also tenders his own affidavit, which both amplifies the arguments in his motion and supplies additional factual evidence that was not tendered during the bench trial. Mr. Connelly's affidavit also adds an additional argument not present in his memorandum of law: that the Court erred in calculating pre-judgment interest.

## ANALYSIS

### A. Standard of review

Mr. Connelly's motion was filed within 28 days from entry of judgment, allowing it to be construed pursuant to Fed. R. Civ. P. 59(e). Such a motion is appropriate to address an intervening change in the controlling law, the discovery of new evidence that was previously unavailable, or the need to correct clear error or to prevent manifest injustice. *Pack v. Hickey*, 776 Fed.Appx. 549, 557 (10th Cir. 2019). In this latter category, such a motion is appropriate where the Court has "misapprehended the facts, a party's position, or the controlling law." *Id.* A Rule 59(e) motion is not "the appropriate vehicle in which to advance for the first time arguments that could have been raised earlier in the proceedings." *Eaton v. Pacheco*, 931 F.3d 1009, 1028 (10th Cir. 2019).

With these standards in mind, the Court declines to entertain any facts raised for the first time in Mr. Connelly's tendered affidavit. Mr. Connelly had a full and fair opportunity to present all pertinent evidence at the time of trial. Nothing in his motion or the material itself indicates that the facts in question are newly-discovered since the time of trial, nor that their relevance to the issues before the Court at the time of trial could not have been anticipated. As such, the Court entertains Mr. Connelly's affidavit only to the extent that affidavit supplements or amplifies the arguments made in his motion based on the factual record that existed at the close of trial.

### B. Proof of acceptance

Mr. Connelly argues that the Court erred in finding that Tatonka accepted Mr. Connelly's offer of the guarantees because Tatonka never produced a version of the guarantees bearing its own countersignature. The Court's Findings and Conclusions addressed this issue in a footnote,

3

noting that the terms of the guarantees signed by Mr. Connelly contain language providing that the effectiveness of the guarantees was not conditioned upon "deliver[y of] an original executed counterpart." Mr. Connelly argues that the Court misinterpreted the context in which that language appears.

The Court need not reach the question of whether it properly interpreted the guarantees' language regarding countersignatures because Tatonka's countersignature on the guarantees is not required in order to give them legal effect. Mr. Connelly raised the same argument – the absence of Tatonka's countersignature on the guarantees prevents it from establishing the existence of an enforceable contract – in opposition to Tatonka's motion for summary judgment, and this Court rejected (**# 112**) that argument. The Court explained[1] that: (i) Colorado law does not generally require that agreements be in writing, much less signed, except as may be required by the Statute of Frauds; and (ii) the Statute of Frauds requires only the signature of the party sought to be bound, namely, Mr. Connelly. Thus, the absence of a countersignature by Tatonka on the agreements does not vitiate the agreements' legal effectiveness.

To the extent Mr. Connelly is arguing that the record lacks proof that Tatonka actually accepted his offer to guarantee the loans, the Court rejects that argument as frivolous. As the Court's summary judgment ruling notes, under Colorado law, whether a party has accepted a contractual offer is assessed based on whether there is objective indicia of the party's intention to accept. Where an offer simply calls for the offeree to take some action,[2] the offeree may accept

---

[1] The Court deems its analysis of this issue in the summary judgment ruling to be incorporated herein.

[2] Mr. Connelly argues that the guarantee agreements "required [Tatonka] to execute the guarantee and deliver a fully executed copy to the other parties." The agreement contains no such requirement on Tatonka. Rather, paragraph 18 of the agreement provides that "This Guaranty shall become effective when it shall have been executed and delivered <u>by the Guarantor</u>" – Mr. Connelly – "to the Lender." (Emphasis added.) Nothing in the agreement

4

the offer simply by performing the requested act; "in such a case, performance is the only thing needful to complete the agreement and create a binding promise." *Denver Truck Exchange v. Perryman*, 307 P.2d 805, 810 (Colo. 1966). Here, the language of the guarantee agreements only imposed upon Tataonka the duty "to make loans to [Mosaica] . . ." There is no dispute that Tatonka made the loans Mosaica was requesting. Therefore, the record is undisputed that Tatonka accepted Mr. Connelly's offer by Tatonka's performance. Mr. Connelly's argument that the Court erred in finding the existence of a valid contract is thus without merit.

### C. Proof of Mosaica's unpaid obligations to Tatonka

Mr. Connelly argues that the record does not support a finding that Mosaica owed (and continues to owe) any funds to Tatonka under the Revolver agreement, the indebtedness that Mr. Connelly guarantee secured. Mr. Connelly argues that, according to the record, "the principal and interest owed [by Mosaica] under the various loan agreements was repaid in full," and that the only sums owing to Tatonka to date are certain quantities of "penalty interest."

Notably, Mr. Connelly's argument does not cite to any portion of the record establishing this fact. (As noted above, the Court declines to consider any newly-tendered facts recited in Mr. Connelly's affidavit.) He cites only to "the testimony of Ms. Hansen at trial," but nothing in Ms. Hansen's testimony supports the proposition that most of Mosaica's debt to Tatonka has been repaid. To the contrary, Ms. Hansen specifically testified that Mosaica still owes Tatonka more than $5 million, and the parties stipulated that a court in a receivership action involving Mosaica reached a similar conclusion.

---

requires any execution by Tatonka. Paragraph 20, which Mr. Connelly cites as supporting his argument, states only that "This Guaranty may be executed in any number of counterparts . . . ." (Emphasis added.) This permissive language does not suffice to create an obligation on Tatonka to execute the agreement in order to preserve its effectiveness.

Mr. Connelly argues – accurately – that Ms. Hansen never specifically testified that this $5 million sum was owed <u>under the Revolver agreement</u>, as opposed to some other loan agreement between Mosaica and Tatonka. But the record supports an inference that Ms. Hansen's $5 million figure referred to amounts due under the Revolver itself. Most significantly, Ms. Hansen's calculation is consistent with (and even somewhat understates) the findings by the court in the Mosaica receivership action that "as of March 31, 2015, the amount outstanding [under the Revolver] was $7,743,841.46." Exhibit 19 at 20. Mr. Connelly did not come forward with any evidence indicating that such sums were ever repaid. Even in his motion, he is left to argue only hypotheticals: that due to unspecified "amounts Tatonka was owed [that] have been repaid, it <u>seems likely</u> that nothing is owed under the Revolver." (Emphasis added.) As between Ms. Hansen's testimony of $5 million still owing under the Revolver, as supported by the findings of the court in the receivership action, and Mr. Connelly's unspecific and speculative argument that no sums remain owing, this Court sees no error in crediting Tatonka's version of the facts. Thus, Mr. Connelly has not shown any error, much less manifest injustice, in this Court's finding that the record supports the conclusion that Mosaica continues to owe Tatonka at least $5 million under the Revolver agreement .

**D. Mistake**

Mr. Connelly offers two arguments that the Court erred in its analysis of his defense of unilateral mistake. First, he argues that the Court erred in requiring him to establish that he acted in reliance upon any misrepresentation (or failure by Tatonka to correct his misunderstanding) of the legal effect of the guarantees. Mr. Connelly argues that such a requirement "appears to be novel in Colorado law under the circumstances" and cites to several cases in which Colorado courts did not separately require a party seeking to reform a contract to show reliance upon the

other side's silence as to a mistaken interpretation. Second, Mr. Connelly argues that, even if he is obligated to prove reliance, the Court erred in concluding that he had not done so.

1. Law

The Court's Findings and Conclusions extensively explained the basis for the Court's conclusion that Mr. Connelly was required to show his reliance upon any misrepresentation Tatonka engaged in about the effect of the guarantees. Colorado has adopted the general principles of the Restatement (2d) of Contracts with regard to the doctrine of unilateral mistake, and the Restatement identifies a series of interlocking considerations that must be demonstrated in order for a party to obtain reformation of a contract under a theory of unilateral mistake.

The basic rule is set forth in Section 153 of the Restatement, but comment *a* to that rule quickly diverts the reader to Sections 160 and 161, which incorporate principles of misrepresentation.[3] *See also comment e* ("The situation in which the other party actually knows of the mistake is covered in § 161"). Section 161 indicates that a contract that arises from a unilateral mistake by one party, where the existence of that mistake was known to and not corrected by the other party, allows the mistaken party to void the contract in the circumstances established by Section 164. *See* Section 161, comment *e*. ("One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and the failure to do so is equivalent to a misrepresentation, which may be grounds for . . . avoidance under § 164"). And Section 164 makes clear that, for the mistaken party to avoid the contract, it must show that "the misrepresentation [ ] induced the recipient to make the contract." Section 164, comment *a*, *c*

---

[3] Comment *a* also notes that "because mistakes are the exception rather than the rule, the trier of fact should examine the evidence with particular care when a party attempts to avoid liability by proving mistake."

7

("no legal effect flows from a [ ] misrepresentation unless it induces action by the recipient, that is, unless he manifests his assent to the contract in reliance on it.") Colorado courts have cited Section 164 of the Restatement as generally reflecting the law of this state. *See generally Crawford v. Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997). *Ice v. Benedict Nuclear Pharmaceuticals, Inc.*, 797 P.2d 757, 759, 761 (Colo.App.. 1990) (both majority and dissent acknowledging Section 164); *Alien, Inc v. Futterman*, 924 P.2d 1063, 1068-69 (Colo.App. 1995).

Admittedly, this Court is not aware of any caselaw in Colorado in which the decision as turned on the issue of whether the mistaken party could demonstrate it relied upon the non-mistaken party's knowing silence when deciding to enter into the contract. But because the element of reliance is clear in Section 164 of the Restatement, and because Colorado law appears to adopt Section 164 of the Restatement, this Court cannot say that it erred in finding that Mr. Connelly was required demonstrate such reliance as an element of his affirmative defense of unilateral mistake.[4]

    2. Proof of reliance

Having concluded that it correctly determined that Mr. Connelly bore the burden of showing that he relied upon Tatonka's misrepresentation as to the true legal effect of the

---

[4] Mr. Connelly's citation to Hoffer, *Misrepresentation: The Restatement's Second Mistake*, 2014 U. Ill. L. Rev. 115 (2013), is not persuasive. In that article, Professor Hoffer concedes the very point Mr. Connelly seeks to dispute: "A contract cannot be voided simply on the basis of a fraudulent or material misrepresentation even if the adversely affected party was justified in relying on it. . . [T]he adversely affected party [must] prove that a misrepresentation induced his assent to the bargain." *Id.* at 134. Professor Hoffer goes on to argue that the doctrine of misrepresentation should merge with the doctrine of mistake, and the element of inducement should be scuttled in favor of an assessment of materiality of the misunderstanding. *Id.* at 138-39. The Court rejects that argument. Materiality is already a key consideration in the reliance analysis, as discussed below.

8

guarantee agreements, the Court turns to Mr. Connelly's argument that he carried that burden. In this regard, the Court acknowledges that, upon a closer examination of the governing law, the Court's Findings and Conclusions erred in finding that Mr. Connelly had not adequately demonstrated his reliance upon Tatonka's concealment of his mistaken understanding of the guarantees.

Section 164 of the Restatement – which imposes the requirement of reliance – directs the reader to Section 167 to determine whether reliance has occurred. Section 167 states "a misrepresentation induces a party's manifestation of assent if it <u>substantially contributes</u> to his decision to manifest his assent." (Emphasis added.) Comment *a* to that section explains that the misrepresentation need not have been "the sole or even the predominant factor in influencing [the mistaken party's] conduct. It is not even necessary that he would not have acted as he did had he not relied on the assertion. It is enough that the manifestation substantially contributed to his decision to make the contract." Comment *b* to Section 167 describes various factors that bear on the question of whether a contracting party relied upon another party's misrepresentation, noting that "the materiality of the misrepresentation is a particularly significant factor in this determination."

Based on these considerations, the Court's finding that Mr. Connelly did not establish that he relied upon Tatonka's concealment of its knowledge that the guarantees secured both the short-term loans <u>and</u> the existing Revolver balance was error. There was sufficient evidence in the record that Tatonka proposed draft versions of the guarantees that secured sums well in excess of the short-term loans and that Mr. Connelly objected to those drafts. Most notably, the testimony about Exhibit 56 demonstrates that Tatonka's initial draft of the guarantee secured more than $1.4 million in Mosaica debt, even though Tatonka was proposing to tender a short-

9

term advance of only about $300,000. One of Mosaica's officials[5] responded to Tatonka explaining that "the amount stated" in the guarantee is "obviously incorrect." Tatonka responded with a new guarantee that purported to secure only $300,000. This is adequate evidence that the amount of Mosaica debt that Mr. Connelly was agreeing to secure was at least a <u>contributing factor</u> in Mr. Connelly's decision to enter into the guarantees.

The Court's prior finding – that Mr. Connelly had not shown that he would not have entered into the guarantees <u>but for</u> Tatonka's concealment of its understanding that the guarantees secured a quantity of existing Revolver debt – is a correct reading of the facts in the record but reflects a misapplication of the principles set forth in Section 167 of the Restatement. But-for causation (*i.e.* "he would not have acted as he did had he not relied upon the assertion") is not what Section 167 requires. The "substantially contributes" factor requires a much lighter showing of reliance by Mr. Connelly, and as set forth above, the evidence supports a finding that the amount of the guarantees was a factor that the parties negotiated to some degree before Mr. Connelly executed the guarantees. And there can be little doubt that the amount being guaranteed is a material term; indeed, it is likely <u>the most</u> material term found in the guarantees. As Section 167 notes, a misrepresentation as to a material term of the agreement is far more likely to support a finding of reliance.

Accordingly, the Court finds that it erred in applying the controlling law on the issue of whether Mr. Connelly demonstrated reliance upon his unilateral mistake in interpreting the meaning of the guarantees. Upon reconsideration, the Court finds that Mr. Connelly sufficiently demonstrated his affirmative defense of unilateral mistake to some extent, entitling him to

---

[5] Although Mr. Connelly was not the person objecting to the initial draft guarantees, he is copied on that e-mail as a co-guarantor. The Court can infer that Mr. Connelly likely shared the same concerns as his co-guarantor about the amounts being secured.

reformation of some of the guarantee agreements. The remaining question, however, is what form that reformation takes.

        3. Reformation

In deciding the extent of reformation, the Court returns to the observations it made in footnote 9 of its Findings and Conclusions. The Court finds that those observations (which it deems incorporated herein) control the degree to which Mr. Connelly is entitled to reformation.

To elaborate: Mr. Connelly's defense of unilateral mistake is meritorious because Mr. Connelly showed that: (i) he had a good-faith misunderstanding as to the legal effect of the guarantees that he executed; and (ii) that Tatonka was aware of that misunderstanding and chose not to correct it. But the Court finds that the record reflects Tatonka's awareness of Mr. Connelly's mistaken understanding of the guarantees' effect did not occur until March 14, 2013, when Mosaica tendered a repayment of one short-term advance and advised Tatonka that the repayment "satisfied" the individual guarantees given by Mosaica's principals. The Court finds that this was the first occasion that Tatonka could have known that Mr. Connelly and the other guarantors had misunderstood the extent to which their guarantees secured Mosaica's debt. The parties' initial negotiations in January 2013 over the specific dollar amounts reflected in the initial guarantee agreement did not so clearly reflect Mr. Connelly's misunderstanding that the Court can say that Tatonka was on notice of that misunderstanding at any earlier time. Discussions of dollar amounts reflected in the guarantees -- $1.4 million vs. $300,000 – would not necessarily reveal to Tatonka that Mr. Connelly misunderstood that the guarantees would secure the stated quantity of existing Revolver debt <u>in addition to</u> Mosaica's repayment of the short-term advances themselves.

Nor did Mr. Connelly's discussion with Mr. Gorka on February 7, 2013 put Tatonka on notice of Mr. Connelly's misunderstanding of the agreements prior to Mr. Connelly agreeing to the first guarantee. As discussed in the Court's Findings and Conclusions, Mr. Gorka testified that on February 7, he and Mr. Connelly had a discussion in which Mr. Connelly stated that he "understood that . . . the guaranty agreements would be satisfied with repayment only of the short-term advances." The record does not reveal when, much less whether,[6] Mr. Gorka conveyed that fact to Mr. Bauers, whom the Court has already found was Tatonka's decision-maker with regard to the guarantees. As the foregoing discussion establishes, Tatonka was not required to clarify Mr. Connelly's mistaken understanding of the guarantees until it learned of that misunderstanding, and the record does not reflect that Mr. Bauers learned of, much less failed to clarify, that mistake <u>prior to</u> Mr. Connelly signing the first guarantee on February 7. Accordingly, the Court finds that Tatonka did not become aware of Mr. Connelly's misunderstanding until March 14, 2013,[7] and thus, any reformation of the guarantee agreements would only apply to those agreements that Mr. Connelly executed after March 14, 2013.

The record reflects that the first guarantee agreement Mr. Connelly signed was on February 7, 2013. Because the Court has found that Tatonka was not aware of Mr. Connelly's misunderstanding of that agreement's language at that time, it did not conceal its knowledge of that misunderstanding from Mr. Connelly, and Mr. Connelly could not have relied upon that

---

[6] Mr. Gorka's testimony seemed to suggest that he shared Mr. Connelly's misunderstanding. Thus, it would come as no surprise if Mr. Gorka did not immediately report Mr. Connelly's statement to Tatonka's officials.

[7] Mr. Connelly argues that Exhibit 48, a February 12, 2013 letter to Tatonka accompanying a repayment check, would have advised Tatonka of Mr. Connelly's misunderstanding of the guarantee's effect. Because Mr. Connelly had already entered into the first guarantee agreement by that date, the determination of whether Tatonka first had notice of his misunderstanding by March 14 or February 12, 2013 is irrelevant.

concealment when entering into the agreement. Thus, Mr. Connelly has not established his affirmative defense of unilateral mistake as to the February 7, 2013 agreement, is therefore not entitled to reformation of that agreement. He therefore is liable to Tatonka for breaching that agreement. Each of the remaining guarantee agreements were signed after March 14, 2013, and the Court finds that Mr. Connelly is entitled to reformation of those agreements to conform them to match his mistaken understanding of their effect (that they secured only the repayment of the short-term loans) that Tatonka chose not to rectify. Thus, the Court will amend the judgment entered in this matter to reflect Mr. Connelly's liability to Tatonka for only the February 7, 2013 guarantee, in the principal sum of $618,000.

### E. Prejudgment interest

Although Mr. Connelly's brief in support of his motion does not raise any contentions that the Court erred in calculating prejudgment interest, his affidavit makes an abbreviated argument to that effect. That argument states, in its entirety: "I respectfully submit that the interest calculation is inaccurate and, in effect, double counting, since the damages suffered by Tatonka as proffered at trial already includes interest (at the rate of 18% per annum) from July 1, 2019[8] through trial."

Mr. Connelly's argument regarding interest is too underdeveloped to justify reconsideration of the Court's prior analysis regarding prejudgment interest. The Court perceives no "double-counting" to have occurred. Certainly, interest accrued on the unpaid Revolver balance between 2013 and 2015, when the receivership action was commenced and

---

[8] The Court assumes that the "July 1, 2019" date is a typographical error, but it is not clear what the correct date would be in Mr. Connelly's argument – *e.g.* a date in 2013 (when the guarantees were issued), in 2016 (when this action was commenced), or in 2019 (when trial occurred and judgment entered).

13

Mosaica was liquidated. But the Court's prejudgment interest calculations began in 2016, when Tatonka commenced this action. By that point, interest accumulating on the Revolver was no longer factored into Mosaica's (and thus, Mr. Connelly's) debt to Tatonka. Thus, Mr. Connelly has not shown that the Court's prejudgment interest formula was in any way erroneous.

Because the Court modifies its findings regarding the extent to which Mr. Connelly is liable to Tatonka, the Court briefly updates that interest calculation. Mr. Connelly's February 7, 2013 guarantee promises to secure $618,000 in unpaid Mosaica debt. The Court's prejudgment interest formula essentially awards interest at the rate of 1.5% per month from May 2016 to the entry of judgment. Because the Court enters an amended judgment today, a total of 41 months have elapsed. Based on the formula of $ 618,000 x .015 x 41, the total amount of prejudgment interest owed by Mr. Connelly is $380,070. Thus, the Court will vacate the judgment entered on May 20, 2019 **(#132)**, and instead enter an Amended Judgment in favor of Tatonka and against Mr. Connelly in the amount of $618,000 in principal and $380,070 in prejudgment interest, for a total of $998,070.

For the foregoing reasons, Mr. Connelly's Motion for Reconsideration **(# 134)** is **GRANTED IN PART** and **DENIED IN PART**. The Court **VACATES** the May 20, 2019 Judgment **(# 132)**, and directs the Clerk of the Court to enter an amended judgment, in favor of Tatonka and against Mr. Connelly, in the amount of $998,070, with costs pursuant to Fed. R. Civ. P. 54(d). That sum will bear post-judgment interest at the rate set by Colorado law.

Dated this 25th day of October, 2019.

BY THE COURT:

_/s/ Marcia S. Krieger_

Marcia S. Krieger
Senior United States District Judge